KAUTZ, Justice.
[¶1] A jury convicted Joshua Ashby Winters of aggravated kidnapping, sexual abuse of a minor in the first degree, and sexual abuse of a minor in the second degree. The district court sentenced him to a total of 80-115 years in prison. He appeals from his convictions and sentences as well as from the denial of his Wyoming Rule of Appellate Procedure 21 motion for new trial, which raised various claims of ineffective assistance of counsel. We affirm.
*197 ISSUES
[¶2] Mr. Winters raises seven issues on appeal, which we distill to four:
1. Whether Mr. Winters' trial counsel rendered ineffective assistance of counsel when he failed to (1) challenge the five-year-old victim's competency; (2) object to inadmissible hearsay; (3) interview any of the State's witnesses; and (4) consult or call a DNA expert.
2. Whether the district court abused its discretion in admitting other acts evidence under Wyoming Rule of Evidence 404(b).
3. Whether there was insufficient evidence to sustain Mr. Winters' aggravated kidnapping conviction.
4. Whether double jeopardy principles require the sentences for aggravated kidnapping and sexual abuse of a minor in the first degree to be merged.
FACTS
[¶3] We provide a brief synopsis of the facts here. Other pertinent facts are included in the discussion of the issues.
[¶4] On July 18, 2016, five-year-old RH accompanied his nine-year old brother, TP, his six-year-old brother, M, and a family friend to the El Marko Bowling Alley in Casper, Wyoming, to play arcade games. While there, they encountered Mr. Winters, a carnival worker who had just finished working at the Central Wyoming Fair & Rodeo. Mr. Winters gave the boys money to play games. At some point, Mr. Winters claimed he was missing money. RH and TP helped Mr. Winters look for the money until they had to leave to report in with their mother at home. According to TP, Mr. Winters told them they "have to come back to help him find his money, then he would give [them] some money." He also told them to tell their mom he was "a friend." The boys went home, but RH returned to the bowling alley alone.
[¶5] It is unclear what occurred at the bowling alley upon RH's return. What is clear is RH and Mr. Winters eventually left the bowling alley and ended up at the North Platte River. Mr. Winters carried RH across the river. Ms. Kellie Brodrecht, a passing motorist, observed Mr. Winters and RH in the middle of the river. She testified Mr. Winters was "struggling to walk" because the water was "pretty high." She stopped and ran to the point on the river bank where she could see the man and child. By that time, the man and child were across the river. The man was lying on the embankment and the child was in the bushes and trees. She yelled, "Are you okay?" but neither the man nor the child heard her so she yelled louder. This time the child peeked his head out from the trees and looked at her but did not say anything. The man got up, looked at her, said "yeah, yeah, thanks," and waved her off. The man then walked into the trees. Because Ms. Brodrecht had no reason to believe they were in danger, she left. Once they were alone, Mr. Winters put his mouth on RH's penis and penetrated RH's anus with his tongue and penis. Mr. Winters threatened to kill RH's family if he told anyone what had happened.
[¶6] Mr. Winters and RH then walked south on Wyoming Boulevard to Fairside Road, where Mr. Winters left RH crying on the side of the road.[1] Shannon Sierra, a passing motorist, eventually found RH and took him to the Mills police station. Casper Police Officer Levi Hallock met RH at the police station. RH's arms, legs, and clothing were covered with sand, his shorts and the back of his shirt were wet, and his left cheek was slightly swollen. Officer Hallock transported him to the Wyoming Medical Center, where he was seen by a Sexual Assault Nurse Examiner (SANE nurse). The SANE nurse found no physical evidence or injuries indicating a sexual assault or anal penetration had occurred, which she testified was "common." After the exam, RH was *198 transported to the Child Advocacy Project (CAP) center for a forensic interview (CAP interview). RH returned the next morning for a second CAP interview. Later DNA testing of RH's penile swabs was inconclusive as to the presence of Mr. Winters' DNA, but similar testing of RH's anal swabs revealed Mr. Winters to be the major contributor of the mixture of DNA present there.
[¶7] The State charged Mr. Winters with aggravated kidnapping under Wyo. Stat. Ann. § 6-2-201(a)(ii), (b)(ii), and (d) (LexisNexis 2017) (Count 1), sexual abuse of a minor in the first degree under Wyo. Stat. Ann. § 6-2-314(a)(i) and (c) (LexisNexis 2017) (Count 2), and sexual abuse of a minor in the second degree under Wyo. Stat. Ann. § 6-2-315(a)(ii) and (b) (LexisNexis 2017) (Count 3). At trial, Mr. Winters admitted he met RH at the bowling alley and they ended up in the river. He claimed, however, RH followed him to the river, RH fell in the river, and he went in the water to save him. They came out of the river on the other side. Mr. Winters said he passed out on the river bank for 10-20 seconds and, when he came to, he saw RH walking away. Mr. Winters got up, grabbed RH's hand, and walked with RH to a pawn shop where Mr. Winters thought he had left his bags. He left RH in the parking lot while he went into the shop. When he came out, RH was no longer in the parking lot. Mr. Winters explicitly denied ever touching RH in a sexual manner. He also claimed to have been drinking heavily that day.
[¶8] The jury convicted Mr. Winters of all charges. The district court sentenced Mr. Winters to (1) not less than 50 years nor more than 70 years on Count 1; and (2) not less than 30 years nor more than 45 years on Count 2, which was merged with Count 3 for purposes of sentencing. The sentences on Counts 1 and 2 were ordered to run consecutively. Mr. Winters filed a timely notice of appeal challenging his convictions and sentences (Appeal No. S-17-0314).
[¶9] Subsequently, Mr. Winters filed a W.R.A.P. 21 motion, seeking a new trial based on ineffective assistance of trial counsel. After holding a hearing, the district court denied the motion. Mr. Winters appealed from that denial (Appeal No. S-18-0247). We consolidated both appeals.
DISCUSSION
[¶10] Mr. Winters raises various claims of ineffective assistance of counsel. He also argues the district court abused its discretion in admitting other acts evidence under W.R.E. 404(b) ; there was insufficient evidence supporting his aggravated kidnapping conviction; and double jeopardy principles required his sentences for aggravated kidnapping and first-degree sexual abuse of a minor to be merged. We start with his complaints against trial counsel.
A. Ineffective Assistance of Counsel
[¶11] A criminal defendant has the right to the effective assistance of counsel. U.S. Const. amend. VI ; Wyo. Const., art. 1, § 10 ; Strickland v. Washington , 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984) ("[T]he right to counsel is the right to the effective assistance of counsel." (quotations omitted)). When a defendant claims he has been denied that right, he must show both that counsel's performance was deficient, and he was prejudiced as a result. Galbreath v. State , 2015 WY 49, ¶ 5, 346 P.3d 16, 18 (Wyo. 2015) ; Strickland , 466 U.S. at 687, 104 S.Ct. at 2064. Counsel acts deficiently when he "fail[s] to render such assistance as would have been offered by a reasonably competent attorney." Galbreath , ¶ 5, 346 P.3d at 18 (quoting Bloomer v. State, 2010 WY 88, ¶ 18, 233 P.3d 971, 976 (Wyo. 2010) ). "Prejudice occurs when there is 'a reasonable probability that, absent counsel's deficient assistance, the outcome of [appellant's] trial would have been different.' " Id . (quoting Bloomer, ¶ 18, 233 P.3d at 976 ). A failure to establish one of the two prongs dooms an ineffective assistance of counsel claim. Dettloff v. State , 2007 WY 29, ¶ 19, 152 P.3d 376, 382 (Wyo. 2007).
[¶12] Ineffective assistance of counsel claims are "mixed questions of law and fact." Griggs v. State , 2016 WY 16, ¶ 37, 367 P.3d 1108, 1124 (Wyo. 2016). We defer to a district court's factual findings unless clearly erroneous; we review de novo the court's legal conclusions, including whether counsel's *199 conduct was deficient and whether defendant was prejudiced as a result. Id . We "invoke[ ] a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable judgment. [T]he paramount determination is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance." Schreibvogel v. State , 2010 WY 45, ¶ 47, 228 P.3d 874, 889 (Wyo. 2010) (citations and quotations omitted).
[¶13] Mr. Winters claims trial counsel was constitutionally ineffective for failing to (1) challenge RH's competency,[2] (2) object to the admission of hearsay testimony, (3) interview any of the State's witnesses, and (4) consult and call a DNA expert.
1. Failure to Challenge RH's Competency
[¶14] Six months before trial, trial counsel told the district court at a scheduling conference he "believe[d]" he would be filing a motion to challenge RH's competency as a witness due to RH's age and the concerns he had after viewing the CAP interviews. But trial counsel "changed [his] mind" and never filed a motion for a competency hearing because he believed RH was competent to testify. He explained at the Rule 21 hearing that although the CAP interview gave him "the impression [RH] had some issues with memory," he believed those issues were "no different than [those] an adult might have in the same situation."
[¶15] Mr. Winters now faults trial counsel for failing to challenge RH's competency to testify. According to him, RH's testimony, as well as the statements he made in the CAP interviews, in particular the second CAP interview,[3] clearly demonstrate RH's inability to understand, receive, remember, and narrate impressions of what occurred. Moreover, while the district court made some inquiry as to whether RH understood an oath is a promise to tell the truth, Mr. Winters argues it failed to make any inquiry as to whether RH understood what it means to tell the truth and the importance of doing so at trial. Finally, he tells us counsel's failure to challenge RH's competency as a witness was prejudicial because RH was the only eye-witness (besides himself) to the events.
[¶16] "[ Wyoming Rule of Evidence 601 ] presumes ... 'every person is competent to be a witness except as otherwise provided in these rules.' " Hutchinson v. State , 2012 WY 155, ¶ 5, 290 P.3d 174, 176 (Wyo. 2012) (quoting W.R.E. 601 ). Indeed, "few persons are inherently incapable of testifying in some manner which is potentially useful." Larsen v. State , 686 P.2d 583, 585 (Wyo. 1984). That includes children, as it is intelligence, not age, which is the deciding factor in determining a witness's competency to testify. Id . at 585-86 ("The age of the victim witness in this case [three at the time of the abuse and five at the time of trial] does not mandate a finding of incompetency."); Mersereau v. State , 2012 WY 125, ¶ 6, 286 P.3d 97, 104 (Wyo. 2012) ("[A] witness' intelligence, not his age, should guide a court in determining whether the witness is competent to testify."), abrogated on other grounds by Rodriguez v. State , 2019 WY 25, ¶¶ 28, 37, 435 P.3d 399, 407-10 (Wyo. 2019). The question is whether the child can " 'understand, receive, remember and narrate impressions and is sensible to the obligations of the oath taken before testifying.' "
*200 Mersereau , ¶ 6, 286 P.3d at 104 (quoting Simmers v. State , 943 P.2d 1189, 1199 (Wyo. 1997) ). In deciding that question, we consider whether the child has:
(1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which he is to testify, to receive an accurate impression of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words his memory of the occurrence; and (5) the capacity to understand simple questions about it.
Larsen , 686 P.2d at 585 (quotations omitted).
[¶17] "Considering the entirety of RH's testimony," the district court concluded "RH was clearly competent to testify." As a result, Mr. Winters had failed to show trial counsel's performance in not contesting RH's competency to be deficient or prejudicially so. In so deciding, the court did not explicitly address the Larsen factors. However, at the Rule 21 hearing, the State cross-examined trial counsel concerning how each factor was satisfied in this case. Reviewing RH's testimony as a whole, as we must, cf. Young v. State , 2018 WY 53, ¶ 15, 418 P.3d 224, 228 (Wyo. 2018) (in deciding whether the district court properly ruled a child witness was competent to testify, "[w]e do not single out isolated statements, but look at the child's entire testimony"), we agree RH satisfied the Larsen factors. His testimony (which Mr. Winters primarily relies upon to establish deficient performance) confirms trial counsel's belief prior to trial that RH was competent to testify and thereby demonstrates no possible prejudice to Mr. Winters from counsel failing to challenge RH's competency.[4]
[¶18] Prior to RH testifying, the district court stated: "I think the [c]ourt should probably make a preliminary inquiry, especially relative to his understanding the oath and competency to proceed." It then proceeded to ask RH how old he was, whether he was in school and its location, whether he understood he had "been called as a witness in this case to testify," whether he understood what an oath was, whether an oath is "a promise to tell the truth," whether he would be willing to promise to tell the truth, and whether he understood he was "being asked to testify about things that were last summer." RH responded he was six-years-old and in school "[a]t Michigan," understood why he was there, knew an oath was a promise to tell the truth, and was willing to promise to tell the truth. He then took the oath "solemnly swear[ing] ... that [his] testimony will be the truth, the whole truth, and nothing but the truth." (Emphasis added). Considering the judge's questions and RH's answers in their entirety, RH understood the obligation to speak the truth at trial.
[¶19] RH's trial testimony also shows he had the mental capacity at the time of the occurrence to receive an accurate impression of it and a memory sufficient to retain an independent recollection of the occurrence. He knew his age, his family members, the ages of his brothers (TP and M), what grade he was in, the location of his school in Michigan, where and who he lived with (in Michigan with "Shantel [his stepmom] and my daddy"),[5] and the number and names of his pets. He also remembered the incident and certain unique details surrounding it, which were corroborated by other independent adult witnesses, including Mr. Winters himself. Specifically, RH testified:
• He met Mr. Winters at the bowling alley (corroborated by the bowling alley manager and Mr. Winters).
• Mr. Winters gave him and his brothers money to play arcade games (corroborated *201 by the bowling alley manager and Mr. Winters).
• Mr. Winters claimed to have lost money at the bowling alley (corroborated by the bowling alley manager and Mr. Winters) and he helped him look for it (corroborated by Mr. Winters).
• He and Mr. Winters eventually left the bowling alley (corroborated by the bowling alley manager) and ended up at the river (corroborated by Ms. Brodrecht and Mr. Winters).
• Mr. Winters hid a bag on the way to the river (corroborated by law enforcement).
• Mr. Winters carried him across the river (corroborated by Ms. Brodrecht and Mr. Winters).
• A female asked him and Mr. Winters if they were okay; he did not respond but Mr. Winters said "[w]e're all right" (collaborated by Ms. Brodrecht and Mr. Winters).
• He was found alone on the side of a road and was picked up by a different passing motorist with children in the car; this passing motorist brought him to the police station (corroborated by law enforcement and Ms. Sierra).
• He was transported from the police station to the doctor (corroborated by law enforcement and the SANE nurse).
[¶20] Finally, RH had the mental capacity to understand the attorneys' questions concerning the abuse and to express in words his memory of it. He told the jury Mr. Winters "humped my leg," "put his pee pee in my butt," "stuck his tongue in my butt," and "put his mouth on [my] pee pee." He testified that when Mr. Winters was "humping" him, Mr. Winters was laying on him and "going up and down." He also explained his "pee pee" is in "[f]ront."
[¶21] Nevertheless, Mr. Winters claims RH was not competent and was not properly evaluated for competency. As to the first Larsen factor, he argues there was no inquiry as to whether RH understood what it means to tell the truth and the importance of doing so as the judge's inquiry was limited to whether RH understood an oath is a promise to tell the truth. Mr. Winters misstates the scope of the judge's inquiry. The judge asked not only whether RH understood an oath is a promise to tell the truth but also ensured RH's willingness to tell the truth. RH then took an oath promising to do so at trial. We have found the first Larsen factor to be satisfied based upon similar circumstances. See Watters v. State , 2004 WY 155, ¶ 18, 101 P.3d 908, 915 (Wyo. 2004) (concluding the first Larsen factor is satisfied where the witness "acknowledged that an oath was a promise to tell the truth and that she was willing to take one").
[¶22] Certainly, a child's understanding of what it means to tell the truth and the importance of doing so may support a district court's competency determination. See, e.g., Griggs , ¶¶ 16, 18-19, 367 P.3d at 1120 (affirming district court's competency determination under the first Larsen factor where victims distinguished between the truth and a lie, gave examples of each, and stated lying is "wrong"); Sisneros v. State , 2005 WY 139, ¶ 35, 121 P.3d 790, 801 (Wyo. 2005) (affirming district court's finding that victim was competent, in part, because "she indicated she understood [her] responsibility [to tell the truth while in court], and repeated numerous times that lying was 'bad' "). However, we have never required such explicit findings to establish the first Larsen factor and decline to do so here. Indeed, even a child's demonstrated understanding of what it means to tell the truth and his being told he "needed to tell the truth" prior to his trial testimony are not conclusive as to his competency if his testimony otherwise reveals he did not understand and appreciate the need to tell the truth in the courtroom. Mersereau, ¶¶ 9-11, 286 P.3d at 104-05.
[¶23] In Mersereau , the victim distinguished between the truth and a lie and provided examples of each at the competency hearing. Mersereau, ¶ 9, 286 P.3d at 104. Nevertheless, at trial, he testified to verifiably false information he knew was not true and commingled his imagination concerning his non-existent pets with the alleged abuse. Id. , ¶¶ 11-12, 286 P.3d at 104-05. We concluded the district court's competency determination was clearly erroneous because the child victim's testimony revealed him to be incompetent.
*202 Id. In this case, on the other hand, while RH was never explicitly asked whether he understood what it means to tell the truth and the need to do so at trial, there is no indication RH did not understand his obligations nor was his testimony patently false or based on a commingling of real and imagined events or objects.
[¶24] Turning to the remaining factors, Mr. Winters claims RH's testimony shows he could not competently remember, recall, and articulate simple answers to questions posed to him about the abuse. For example, he claims RH was inconsistent as to how he ended up in the river (claiming Mr. Winters wanted him to go into the river and took his hand but then claiming he "slipped" into the water) and why he returned to the bowling alley after checking in at home (first claiming his brother M told him to return and then claiming he did not know why he returned). Such inconsistencies, however, go to RH's credibility and the weight to be given his testimony, not his competency. Griggs , ¶ 24, 367 P.3d at 1121 (inconsistencies in child witness's testimony "have more to do with her credibility and the weight to be accorded her testimony than her competence to testify"); Sisneros , ¶ 37, 121 P.3d at 802 (same); see also Young , ¶ 19, 418 P.3d at 229 ("[C]ompetence is not the same as credibility.").
[¶25] Mr. Winters also claims RH gave non-sensical answers. For instance, when asked the positions of his and Mr. Winters' bodies when Mr. Winters "humped" his leg, RH stated his body was "[s]cared" and Mr. Winters' body was "Good. But he got sick." When asked what he meant by the latter response, he said, "When he went to jail, he got sick."[6] Similarly, when asked whether RH stayed in one place after Mr. Winters left him on the side of the road, he responded, "I walked into a lady's car." (Emphasis added). And finally, when asked how he got to the other side of the river, RH said he swam yet admitted he did not know how to swim. These allegedly non-sensical answers correspond directly with the nature and quality of the questions posed to him. Moreover, they demonstrate the need to consider a child's testimony as a whole, rather than hone in on isolated statements as Mr. Winters does.
[¶26] The State asked RH "[h]ow were your bodies" and "how was [Mr. Winters'] body" when Mr. Winters humped his leg. (Emphasis added). Although the State was seeking the position of RH's and Mr. Winters' bodies, it was not illogical, given the form of the question, for RH to respond with the condition or quality of their bodies, i.e., "Scared" and "Good. But he got sick." Indeed, once the State clarified the question, RH responded Mr. Winters was "[l]aying down ... [o]n me." Similarly, the State asked RH whether he stayed where he was or "walk[ed] somewhere else" after Mr. Winters left him on the side of the road; not surprisingly, RH responded, "I walked into a lady's car." (Emphasis added). And, prior to asking RH how he got to the other side of the river, trial counsel asked RH how Mr. Winters got in the river. RH responded, Mr. Winters "walked down to there and he holded me and he was swimming." Trial counsel then asked, "And so now you're both in the river, right?" and RH said, "Yeah." Thus, when counsel asked RH, "How did you get to the other side? Did you walk or swim?" RH logically interpreted "you" to mean both him and Mr. Winters. (Emphasis added). From context, RH obviously meant Mr. Winters swam across the river while holding RH.
*203 [¶27] Finally, Mr. Winters claims RH testified to an impossibility. When the State asked RH whether his "clothes ever c[a]me off," he responded, "Huh-uh ... they stayed on." According to Mr. Winters, he could not have stuck his penis and tongue in RH's anus if RH's clothes never came off. But Mr. Winters could have accessed RH's genitals by lowering RH's shorts, in other words, without RH's clothes ever "com[ing] off." Or RH could have been referring to the fact that while his shorts came off, his shirt remained on. Trial counsel's questions on cross-examination did not clarify the matter. He asked RH whether he knew what "naked" meant; RH said he did not. Counsel defined it as meaning "you have no clothes on at all, like when you take a bath" and RH indicated he understood. RH then testified Mr. Winters was "naked" but he was "never naked." Again, that RH was "never naked" certainly does not render the sexual abuse an impossibility.
[¶28] Admittedly, RH's testimony was not perfect. But "a witness need not be perfect to be competent to testify." Griggs , ¶ 12, 367 P.3d at 1119. Rather, RH needed to satisfy the Larsen factors and his testimony reveals he did so. Because RH was clearly competent to testify, Mr. Winters was not prejudiced by trial counsel's failure to challenge his competency.
2. Failure to Object to Inadmissible Hearsay
[¶29] The State initially called Casper Police Officer Levi Hallock as a witness prior to RH testifying. Officer Hallock described responding to the Mills police station upon receiving notice RH had been found.[7] Officer Hallock eventually placed RH in his patrol car to speak with him. Officer Hallock explained:
A. ... I first asked him if he was all right. And he told me that he was not all right, he was not okay. I asked him if he had been at the bowling alley playing video game[s] with his brothers. He told me that the brothers had been playing games. I spoke with him and asked him if he had left the bowling alley with his brothers or anyone else. He told me that he had left the bowling alley with the guy that gave him things.
Q. Okay.
A. Do you want me to continue?
Q. Yeah. What happened then?
A. Continuing, I asked [RH] ... if he had gone anywhere, and he told me that the ... man had taken him ... by the river to show him his camp.
Q Okay.
A. I asked him, you know, what took place by the river.
At this point, defense counsel objected on hearsay grounds. The State argued the statements were admissible under the excited utterance exception to the hearsay rule, but the district court sustained the objection.
[¶30] Later, RH testified. He told the jury that after he and Mr. Winters crossed the river, Mr. Winters "humped my leg and he put his pee pee in my butt," "stuck his tongue in my butt," and "put his mouth on [my] pee pee." After RH's testimony, the State called Rosemary Bartle, who performed the first CAP interview. During her testimony, the State, without objection, played the videotape of the first CAP interview for the jury.[8] Among other things, RH told Ms. Bartle during the interview that a man with a hat and "mean" clothes "stole" him from the bowling alley; he and the man walked to the "lake" and went in the water; the man was holding onto him in the water by his hip and then let go so he thought he was drowning; the man touched his "private stuff" with his mouth; and his private stuff "makes [him] go to the bathroom." The State then re-called Officer Hallock as a witness. This time, without objection, Officer Hallock testified as to what RH told him had happened at the river:
*204 What the child told me was after going to a campsite near the river with a male subject, the male subject had touched him all over and put his mouth on his privates. ... [And] that the man told him if he screamed or told anybody about what had happened, he would kill him.
[¶31] Mr. Winters complains trial counsel was ineffective for failing to object to the admission of the first CAP interview and RH's statements to Officer Hallock because both were clearly inadmissible hearsay. See W.R.E. 801 (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."), W.R.E. 802 (stating hearsay is generally inadmissible). Yet, he acknowledges a declarant's prior consistent statements are "not hearsay if ... [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive." W.R.E. 801(d)(1)(B). This rule makes clear a witness's prior consistent statements are not considered hearsay if four conditions are met: (1) the declarant testifies at trial; (2) the declarant is subject to cross-examination concerning the prior statement; (3) the prior statement is consistent with the declarant's trial testimony; and (4) the prior statement is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive. Griggs , ¶ 98, 367 P.3d at 1136.
[¶32] The district court concluded the CAP interview and RH's statements to Officer Hallock were admissible as prior consistent statements under Rule 801(d)(1)(B) and trial counsel was not deficient in failing to object. We agree.[9]
[¶33] Mr. Winters does not challenge the first two conditions and rightly so-RH testified at trial and was subject to cross-examination. And, while Mr. Winters claims RH's statements to Officer Hallock were not consistent with RH's trial testimony (the third factor), he does so for the first time in his reply brief. We need not reach this argument. See Pena v. State , 2004 WY 115, ¶ 44 n.6, 98 P.3d 857, 874 n.6 (Wyo. 2004) ("A reply brief is not the place for an appellant to *205 present new issues."); W.R.A.P. 7.03 (stating a reply brief is limited to the "new issues and arguments raised by the brief of the appellee"). Even considering it, however, does not help him.
[¶34] Under the third requirement of Rule 801, "it is the consistency, rather than the substance of the consistent statement, which takes such a statement out of the realm of objectionable hearsay and tends to prove the value of the original statement." Curl v. State , 898 P.2d 369, 374 (Wyo. 1995). The prior statement need only be "generally consistent" with, not identical to, the declarant's trial testimony. See Griggs , ¶ 100, 367 P.3d at 1137 ; see also Curl , 898 P.2d at 374. That being said, the prior consistent statement cannot be used "to fill in the gaps" in the declarant's testimony. Martin v. State , 2007 WY 76, ¶ 29, 157 P.3d 923, 930 (Wyo. 2007) ; see also Curl , 898 P.2d at 374 (the prior consistent statement exception to hearsay cannot be used to prove "new points not covered in the [declarant's] testimony") (quoting 4 Christopher B. Mueller and Laird C. Kirkpatrick, Federal Evidence § 405 at 181 (2d ed. 1994)).
[¶35] Mr. Winters claims RH's statements to Officer Hallock were inconsistent with RH's trial testimony in three regards. First, RH told Officer Hallock Mr. Winters had touched him "all over," but RH testified Mr. Winters never touched him with his hands. This argument assumes that when RH told Officer Hallock Mr. Winters touched him "all over," he meant Mr. Winters touched him "all over" with his hands. But RH never told Officer Hallock Mr. Winters touched him "all over" with his hands. We can imagine other ways Mr. Winters could have touched RH "all over" without using his hands, i.e., with his mouth or penis. Second, RH told Officer Hallock Mr. Winters put his mouth on his privates, but RH told the jury his clothes never came off. As we have already explained, there are several explanations for how Mr. Winters could have placed his mouth on RH's privates without RH's clothes ever being completely off. Third, RH told Officer Hallock Mr. Winters had threatened to kill him, whereas RH testified Mr. Winters had threatened to kill his family. RH consistently told both Officer Hallock and the jury that Mr. Winters had threatened lethal force, only the victim was different.
[¶36] In the end, we do not find the differences between RH's statements to Officer Hallock and his testimony to be significant enough to render them outside the scope of Rule 801(d)(1)(B). Rather, RH consistently told Officer Hallock and the jury that Mr. Winters sexually abused him by placing his mouth on his privates and then threatened force should he tell anyone. And, importantly, RH's statements to Officer Hallock were more general than his trial testimony-they were not used to prove new points not covered in RH's direct testimony.
[¶37] Turning to the fourth condition for admissibility under Rule 801(d)(1)(B), prior consistent statements of a witness are allowed only to rehabilitate a witness after his credibility has been impeached and only when that credibility has been impeached in a manner described in the rule, i.e., by an express or implied charge against the witness of recent fabrication or improper influence or motive. Jones v. State , 2019 WY 45, ¶¶ 23-25, 439 P.3d 753, 760-61 (Wyo. 2019) ("[P]rior consistent statements offered in anticipation of an attack described in the rule should not be admitted."). As we explained in Jones :
Trial courts must be cautious lest they allow admission of prior consistent statements any time a victim's credibility is questioned. A defense to crimes such as those at issue here [sexual abuse of a minor] will necessarily entail a defense theory that what the victim said happened did not happen. That alone does not open the door for admission of prior consistent statements.
Id. , ¶ 24, 439 P.3d at 761. However, "[t]he charge of fabrication or improper motive need not come only as a specific allegation during cross-examination; ... it may be made by implication or innuendo, and it may be found in the thrust of the defenses and testimony presented." Lancaster v. State , 2002 WY 45, ¶ 18, 43 P.3d 80, 89 (Wyo. 2002) (quotations omitted), overruled on other grounds by Jones , ¶ 25, 439 P.3d at 761-62. Mr. Winters claims this requirement was not *206 met because there was no allegation, express or implied, at trial that RH had recently fabricated his version of events or that he had been improperly influenced or had an improper motive. We disagree.
[¶38] Dr. Fred Lindberg, a clinical psychologist, was called by the State to tell the jury about how children who have experienced a traumatic event will communicate that trauma to others. He described a child's disclosure of a traumatic event as a "process, not an event," meaning the child will disclose a little at a time or "may never disclose all of what allegedly happened to them." During cross-examination, trial counsel asked Dr. Lindberg a series of questions about the factors that may come into play in how well a five-year-old child communicates a traumatic event. He also asked him: "[W]hat about ... if the child is subjected to adults suggesting things to them, does that cause a problem with memory?" Dr. Lindberg responded, "Suggestibility at age 5 could be a problem, yes, sir." Counsel then questioned Dr. Lindberg whether "leading questions can cause suggestive problems to the child," to which Dr. Lindberg responded: "[I]f you're talking about forensic interviews, the ... goal of forensic interviews is to be nonleading, nonsuggestible." He admitted, however, leading questions do occur during such interviews, but they are not desirable "because ... the interviewer might be ... suggesting the answer" or worse "planting things in the child's mind."
[¶39] Similarly, during cross-examination of RH, trial counsel asked him if somebody had told him the word "hump;" RH responded "[n]ope." Counsel also asked RH whether anyone had talked to him "about things that [he] had said before" to which RH responded, "[o]nly the cops." He then asked RH whether anyone had talked to him the day before trial "about what [he was] going to do [at trial]." RH stated his mother and the prosecutor had talked to him and "go[ne] over things that [he] said before." And, when asked whether "anybody tr[ied] to help [him] remember things," RH responded "[y]es" and admitted "[it] help[ed] [him] remember."
[¶40] Through the cross-examination of Dr. Lindberg and RH, which occurred prior to the admission of the first CAP interview and RH's statements to Officer Hallock, Mr. Winters impliedly, if not explicitly, charged RH with having been improperly influenced by his mother and the prosecutor or by the leading questions of Ms. Bartle during the first CAP interview. See Jones , ¶ 26, 439 P.3d at 762 (defense counsel's cross-examination of child victims, which included questions concerning conversations they had with others about what the defendant had done and whether anyone had helped them prepare to testify, impliedly charged "recent fabrication or improper influence or motive"). Because this cross-examination occurred prior to admission of the prior consistent statements, the fourth requirement of Rule 801(d)(1)(B) was satisfied.
[¶41] As a final matter, Mr. Winters relies on Wilde v. State , 2003 WY 93, 74 P.3d 699 (Wyo. 2003), to support his claim that RH's statements to the officer and the CAP interviewer were inadmissible. Mr. Wilde claimed the child victim fabricated at least part of her story. Id ., ¶ 12, 74 P.3d at 707. The State attempted to bolster the victim's testimony by presenting five witnesses-her mother, police officer, physician, nurse and forensic interviewer-to whom the victim had told her story. Id. , ¶ 11, 74 P.3d at 706. Each repeated the victim's story to the jury "without much variation." Id. , ¶ 12, 74 P.3d at 707. We concluded the district court abused its discretion in admitting these hearsay statements. Id. , ¶ 14, 74 P.3d at 707. Reading Wilde as a whole, it is clear our concern was with the State's presentation of numerous witnesses to repeat the victim's allegations, thereby " 'piling on' " consistent statements. Id. , ¶ 14, 74 P.3d at 707-08 (quoting 4 Christopher B. Mueller and Laird C. Kirkpatrick, Federal Evidence, § 405 (2nd ed. 1994 and Supp. 2002)); see also Griggs , ¶ 109, 367 P.3d at 1139. That did not occur in this case.
[¶42] Wilde is important in another respect, however. It emphasizes the need to ensure the prior statements were made in a manner that would be expected from a victim rather than procured by the State "for the direct purpose of using those statements later at trial as prior consistent statements." See *207 Tombroek v. State , 2009 WY 126, ¶ 14, 217 P.3d 806, 812 (Wyo. 2009) (citing Seward v. State , 2003 WY 116, ¶¶ 16-17, 76 P.3d 805, 811-12 (Wyo. 2003) ); see also Jones , ¶ 17, 439 P.3d at 758. In this case, RH's statements during the first CAP interview and to Officer Hallock were made "in a manner that would be expected from a victim in the early stages of a typical sexual assault investigation, rather than in a manner resembling trial preparation tactics." Tombroek , ¶ 14, 217 P.3d at 812 ; see also Jones , ¶ 22, 439 P.3d at 760 (stating the record does not show the State procured the CAP interviews of the victims "for the purpose of presenting them at trial to bolster the children's statements"). We see no attempt by the State to abuse Rule 801(d)(1)(B)'s hearsay exception. And, although he cites to Wilde , Mr. Winters does not point to anything suggesting such an attempt by the State.
[¶43] Because they were admissible under Rule 801(d)(1)(B), trial counsel was not ineffective in failing to object to the admission of the first CAP interview or RH's statements to Officer Hallock.[10]
3. Failure to Interview State's Witnesses Prior to Trial
[¶44] At the Rule 21 hearing, trial counsel admitted he did not interview or attempt to interview any of the State's witnesses. Mr. Winters argued trial counsel's failure to do so constituted deficient performance. The district court decided otherwise:
Reviewing the evidence presented in this case, including the inaccessibility trial counsel had to interview RH, the familiarity trial counsel had with Dr. Lindberg's testimony as an expert, and trial counsel's prior working knowledge of DNA evidence, it is clear that trial counsel made reasonable investigative decisions in this case. Mr. Winters has failed to demonstrate that trial counsel's failure to interview and confront RH, Dr. Lindberg, and Ms. Normington pretrial was outside the realm of professionally competent assistance, and that such resulted in prejudice to the defense of the criminal charges in the case.
[¶45] On appeal, Mr. Winters again complains of counsel's failure to interview any of the State's witnesses. However, the only specific arguments he makes relate to RH and the State's DNA expert, Kathryn Normington.[11] We confine our analysis accordingly.
[¶46] A claim of ineffective counsel based on a failure to interview witnesses is reviewed as a claim of failure to conduct a reasonable investigation. See *208 Duke v. State , 2004 WY 120, ¶ 55, 99 P.3d 928, 947 (Wyo. 2004) (analyzing Duke's claim that counsel failed to interview any of the State's witnesses as a failure to make reasonable investigation); Gist v. State , 737 P.2d 336, 343 (Wyo. 1987) ("The failure to pursue an interview of Roger Gist constituted an abrogation of counsel's duty to Steve Gist to conduct a reasonable investigation ...."). "Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Duke , ¶ 55, 99 P.3d at 947. We "assess[ ] counsel's performance by considering all of the circumstances existing at the time counsel made the investigative decision and appl[y] a heavy measure of deference to counsel's judgments in this regard." Id . "[A]n appellant cannot prove ineffective assistance of counsel for failure to investigate 'where an appellant fails to identify the favorable evidence or witnesses that additional investigation would have revealed.' " Brock v. State , 2012 WY 13, ¶ 17, 272 P.3d 933, 938 (Wyo. 2012) (emphasis added) (quoting Asch v. State , 2003 WY 18, ¶ 41, 62 P.3d 945, 958-59 (Wyo. 2003) ).
[¶47] At the Rule 21 hearing, trial counsel explained he did not interview RH because, from experience, he knew that although the State does not tell the victim he cannot speak with defense counsel, it does advise him not to do so.[12] Mr. Winters does not seriously contest the validity of this reason and, as trial counsel predicted, had he requested to interview RH, his mother confirmed she would not have allowed it. In any event, Mr. Winters has failed to show how he was prejudiced by counsel's failure to interview RH.
[¶48] In his opening brief, Mr. Winters generally complains trial counsel's failure to interview RH was prejudicial because it led to an inadequate cross-examination of RH, namely trial counsel "failed to reasonably confront and question RH at trial regarding his many inconsistent statements made during the two CAP interviews and his trial testimony." However, "[w]hether to cross-examine and the extent of cross-examination are strategic decisions. The risk of excessive cross-examination is that the witness may reconcile inconsistencies, additional unfavorable testimony may be elicited, and ineffective efforts to attack credibility may in fact enhance the witness's testimony." Barkell v. State , 2002 WY 153, ¶ 23, 55 P.3d 1239, 1244 (Wyo. 2002). As the district court explained in denying Mr. Winters' Rule 21 motion: "[M]ore vigorous questioning of RH and attacking him on cross-examination could have had a negative effect on the defense in an already difficult case."
[¶49] Nevertheless, our review of trial counsel's cross-examination of RH reveals it to have been effective. RH admitted: (1) his mother and the prosecutor had reviewed with him the things he had said previously, someone had helped him remember things, and it had helped him remember things; (2) he lied to Mr. Winters that TP had taken his money; (3) he "slipped" into the river; and (4) Mr. Winters "help[ed]" him get across the river by carrying him so he "wouldn't drown." These latter two points were significant because they were consistent with Mr. Winters' version of events and undermined the State's theory it was Mr. Winters who took RH into the river.
[¶50] In his reply brief, Mr. Winters expounds upon his prejudice argument, claiming had counsel interviewed RH prior to trial, he would not have asked RH on cross-examination whether Mr. Winters had put his mouth on RH's "pee pee." According to Mr. Winters, it was not until this question that RH claimed Mr. Winters put his mouth on RH's penis. That is true. But, once again, we need not consider this argument as it was raised for the first time in his reply brief. See Pena , ¶ 44 n.6, 98 P.3d at 874 n.6. Nevertheless, it appears trial counsel's question was strategic. As we explain later, Mr. Winters' DNA was not conclusively found on RH's *209 penile swabs. However, trial counsel elicited from Ms. Normington that one would expect Mr. Winters' DNA to have been found on those swabs if Mr. Winters had put his mouth on RH's penis. Therefore, by having RH tell the jury Mr. Winters put his mouth on his privates and then having the State's expert admit that if that had occurred Mr. Winters' DNA would be on RH's penile swabs, trial counsel effectively undermined RH's version of events. Moreover, we fail to see how Mr. Winters was prejudiced by this question as the jury later heard RH telling Ms. Bartle (during the first CAP interview) and Officer Hallock that Mr. Winters had put his mouth on RH's privates.
[¶51] Having failed to show prejudice, Mr. Winters claims prejudice is presumed in this case because RH was the only eye-witness to the abuse. He relies on King v. State , 810 P.2d 119 (Wyo. 1991). In King , defense counsel failed to interview or secure the testimony of two alleged eye-witnesses who would have likely supported Mr. King's claim the crime never occurred. Id. at 120-22. We concluded:
"The failure to pursue an interview [with an alleged eye witness] constitute[s] an abrogation of counsel's duty to * * * conduct a reasonable investigation and to utilize any information obtained in providing a reasonable defense." Gist , 737 P.2d at 343. When this deficiency is demonstrated, the appellant need not demonstrate the resulting prejudice, it is presumed. "Prejudice in [this circumstance] is so likely that case-by-case inquiry into prejudice is not worth the cost." Strickland , 466 U.S. at 693, 104 S. Ct. at 2067. See also Sanders v. Sullivan , 701 F. Supp. 996 (S.D.N.Y.1987), also involving a failure to secure attendance at trial; and Richardson v. State , 189 Ga. App. 113, 375 S.E.2d 59 (1988), where proposed alibi witnesses were neither interviewed nor subpoenaed.
King 's reliance on Strickland is misplaced, as Strickland was speaking to the "[a]ctual or constructive denial of the assistance of counsel altogether" and "state interference with counsel's assistance." Strickland , 466 U.S. at 692, 104 S.Ct. at 2067. In any event, this case is clearly distinguishable from King .
[¶52] There, trial counsel failed not only to interview two potential eye-witnesses with favorable information, he also failed to secure their trial testimony. King , 810 P.2d at 120-22. In essence, King involved the failure to present a potential defense at trial. In this case, while RH was the only eye-witness, he was also the victim. As a result, he testified for the State and his testimony was not favorable to Mr. Winters. Not only that, he was forensically interviewed prior to trial. Trial counsel knew what RH was going to say and, again, it was not helpful to Mr. Winters.[13]
[¶53] Turning to counsel's failure to interview Ms. Normington, trial counsel stated at the Rule 21 hearing that he reviewed the litigation support packet, which included Ms. Normington's report and the results and data of her testing. He also described his decision not to interview Ms. Normington as a matter of strategy:
I don't like to interview any of the State's witnesses where I have reports because ... if I talk to a State witness and I even suggest where I'm going to be going at trial, they get in touch with [the prosecutor]
*210 immediately and tell them what the interview is about ... [a]nd therefore it takes any ... element of surprise to where the defense is going, and I just don't find you get much out of them. I have their ... statement[s], and I'd rather cross-examine them at trial. That's my philosophy on those types of witnesses.
Counsel is entitled to "wide latitude" in making such "tactical decisions." Strickland , 466 U.S. at 689, 104 S.Ct. at 2065 ; see also Dickeson v. State , 843 P.2d 606, 609 (Wyo. 1992) (stating defendant has burden to overcome presumption that the "challenged action or failure of the attorney might be considered sound trial strategy").
[¶54] Mr. Winters, however, claims trial counsel's strategy is belied by Ms. Normington's Rule 21 testimony, where she stated she was available to speak with trial counsel and, if she did, she would not have disclosed what was discussed to the prosecutor. In determining the reasonableness of an investigative decision, such as the decision not to interview an expert prior to trial, we look to "the circumstances existing at the time counsel made the investigative decision ." Duke , ¶ 55, 99 P.3d at 947 (emphasis added); see also Strickland , 466 U.S. at 689, 104 S.Ct. at 2065 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). At that time, counsel did not know any discussions he had with Ms. Normington would not be shared with the prosecutor. Nevertheless, Mr. Winters' claim suffers a more fatal flaw; he did not show he was prejudiced by counsel's failure to interview Ms. Normington prior to trial.
[¶55] Mr. Winters claims a pretrial interview of Ms. Normington would have allowed trial counsel to more effectively cross-examine her as to some points "that would have significantly corroborated [Mr.] Winters' version of events and his theory of the case." Yet, he does not identify what additional points could have been made on cross-examination which were not and which would have been helpful to him. Barkell , ¶ 20, 55 P.3d at 1244 ("Although generally critical, Barkell does not make any concrete suggestions for cross-examination that should have been pursued, and therefore does not rebut the presumption that counsel's cross examination was effective."). While he points to the opinions offered by his Rule 21 DNA expert, Dr. Monte Miller, there is no evidence a pretrial interview of Ms. Normington would have uncovered these opinions or that Ms. Normington would have expressed the same opinions. In fact, as we explain next, Dr. Miller would have opined the DNA found on RH's penile swabs was consistent with that of Mr. Winters, whereas Ms. Normington told the jury only that there was insufficient data to decide whether Mr. Winters' DNA was on RH's penile swabs. Additionally, as we will explain in more detail below, trial counsel effectively cross-examined Ms. Normington, downplaying the harmful DNA evidence and drawing key concessions from Ms. Normington which supported Mr. Winters' defense theory.
[¶56] Trial counsel was not deficient in failing to interview RH or Ms. Normington prior to trial and, even assuming arguendo he was, Mr. Winters cannot show he was prejudiced as a result.
4. Failure to Consult or Call a DNA Expert
[¶57] Ms. Normington, a senior forensic scientist at the Wyoming State Crime Laboratory, performed the DNA testing on RH's anal and penile swabs. She testified for the State that a mixture of DNA was found on RH's anal swabs and the major contributor of that DNA was Mr. Winters. Her reports were also submitted to the jury. In one of her reports, but not specifically testified to, she concluded the swab of RH's left hand contained a mixture of DNA which included RH's DNA and that of another individual or individuals. However, no conclusion could be made whether the mixture included Mr. Winters' DNA because the "data ... was too low to reliably interpret."
[¶58] On cross-examination, Ms. Normington admitted she did not test the DNA to determine whether it came from semen or blood and the amount of Mr. Winters' DNA found on RH's anal swabs was .00037 nanograms, *211 a very small amount. She also testified there was a possible mixture of DNA on RH's penile swabs, but she could not make a conclusion as to whether RH or Mr. Winters was a contributor because the "data was too low to reliably interpret." Yet, she admitted "if an individual put someone else's penis in their mouth and it wasn't that long in time afterwards," you would expect to find the individual's DNA on a penile swab. She also told the jury a person's DNA can be transferred to another individual via innocent touch or DNA transfer, which Ms. Normington described as if Person A rubs Person B's sleeve with her hand and then Person C rubs Person B's sleeve with her hand, Person A's DNA could be found on Person C's hand. She conceded it was possible that if a person was holding someone's hand and one of the individual's "scratched [his] butthole," the other person's DNA could be transferred to the individual's anus. And, she admitted even a major contributor's DNA could have arrived on the source via DNA transfer. Finally, she told the jury DNA evidence is not infallible and is subject to human error.
[¶59] During closing argument, trial counsel pounded the point home, emphasizing the extremely small amount of Mr. Winters' DNA found on RH's anal swabs[14] and Ms. Normington's admission that such small amount was consistent with DNA transfer. He then asked the jury, "Is it so ridiculous to think when we've had testimony about a kid being in the river and he had sand, is it so ridiculous to think that that little boy's butt didn't itch and he didn't scratch it?" He also highlighted the lack of DNA on RH's penile swabs, asking the jury, "Do you think that if ... [RH's] penis was in my client's mouth, as the State wants you to believe, that there wouldn't be any DNA? None? That's ridiculous."
[¶60] In his Rule 21 motion, Mr. Winters complained trial counsel was prejudicially deficient in failing to consult with or call a DNA expert at trial. In support, he provided an affidavit and testimony from Dr. Miller, a DNA expert and forensic scientist, who was available to testify at trial and would have told the jury:
(1) no semen or sperm was detected by the crime lab;
(2) no serological testing, i.e., testing to identify bodily fluids, was carried out in this case but it should have been done;
(3) DNA found on RH's left hand was consistent with Mr. Winters;
(4) Mr. Winters' DNA was not found on RH's penis yet had Mr. Winters placed his mouth on RH's penis, as alleged, saliva would have been present and detectible;
(5) RH's DNA was not detected on Mr. Winters' penis but an unknown person's DNA was present; if Mr. Winters had rubbed his penis against RH, as alleged, there was a "strong possibility" that RH's DNA would have been present on Mr. Winters' penis;
(6) while Mr. Winters' DNA was a major contributor of the DNA found on RH's anal swabs, there was also DNA from RH and another unknown person, thereby demonstrating that a third person's DNA was transferred to RH's anus without any sexual contact;
(7) given the level of interaction between Mr. Winters and RH, there are numerous innocent explanations for Mr. Winters' DNA being present on RH's anus, including RH holding Mr. Winters' hand and then scratching his anus, water from Mr. Winters could have run down the back of RH while coming out of the river, and Mr. Winters could have coughed or sneeze on RH while coming out of the river; and
(8) the amount of Mr. Winters' DNA on RH's anal swabs was exceptionally low and consistent with secondary DNA transfer rather than saliva.
The district court rejected the claim:
[T]rial counsel was well versed in DNA testing and results. He was able to effectively cross examine the State's DNA expert, and point out areas of doubt in the DNA tests and the lack of positive DNA results for sperm and saliva. Mr. *212 Winters' defense was more than adequately presented by his own trial testimony, and trial counsel's cross examinations of the State's witnesses. Reviewing the evidence presented, it cannot be determined that trial counsel's failure to consult and call a DNA expert was ineffective assistance of counsel. Furthermore, even if trial counsel's failure was deficient, there has been no showing of prejudice to Mr. Winters. Mr. Winters has only shown that the defense's theory of the case was not accepted by the jury, and it is complete speculation to conclude that testimony from an expert would have changed the outcome of the trial.
[¶61] Mr. Winters reiterates the arguments he raised in the district court. He says Dr. Miller's opinions, which provided reasonable alternative interpretations of the DNA evidence in his favor, would have cast reasonable doubt on the State's theory of the case and RH's version of the events.
[¶62] "When an ineffective assistance claim is based upon the failure to call an expert witness, the defendant must show an expert was available who would have testified consistently with his theory." Cooper v. State , 2014 WY 36, ¶ 22, 319 P.3d 914, 920 (Wyo. 2014), see also Osborne v. State , 2012 WY 123, ¶ 20, 285 P.3d 248, 252 (Wyo. 2012). "[E]ven if there is an expert available who will testify consistent with a theory of defense, the defendant must also show that his counsel did not act as a reasonably competent attorney in determining whether expert testimony was necessary under the specific circumstances of the case and/or how to use the expert's services." Griggs , ¶ 38, 367 P.3d at 1124-25 (citing Thompson v. Belleque , 268 Or.App. 1, 341 P.3d 911, 922 (2014) (stating "[a]mong the universe of reasonable tactical decisions is the decision not to present expert evidence")).
[¶63] Trial counsel testified he had been a State public defender since 2000, so approximately 17 years at the time of trial. He had tried between 40 and 50 cases, including murder and sexual assault cases involving DNA. He attended a week-long seminar regarding DNA analysis, had consulted with DNA experts in the past, and had read various articles on DNA. While he knew he was not a DNA expert, he believed he had a "fair understanding" of DNA and a sufficient knowledge of it to "make strategic decisions." His strategic decision in this case was to minimize the damaging DNA evidence through cross-examination of Ms. Normington. And, although that strategy did not result in Mr. Winters' acquittal, it was successful in addressing many of the matters Dr. Miller would have opined on, while at the same time avoiding testimony that would have hurt Mr. Winters.
[¶64] First, Ms. Normington admitted on cross-examination she did not know whether the DNA found on the anal swabs came from saliva or semen because no serological testing had been performed. Although she did not opine, as Dr. Miller did, that serological testing should have been done in this case, even Dr. Miller's opinion contained an important caveat: "In this case, had testing been carried out with subsequent negative results (meaning no semen, sperm, or saliva was detected), this information would have been useful to Joshua Winters at trial." Consistently, Dr. Miller admitted at the Rule 21 hearing that asking for more testing is a "double-edged sword" and counsel should know the results will help his client before asking for more testing. Trial counsel agreed, stating further DNA or serological testing is always a gamble; while it could be helpful, it could also prove "very hurtful" to a defendant depending on the results and "there's nothing worse than proving the State's case for them." That is why trial counsel did not seek more testing but rather was pleased the testimony simply showed no semen or saliva was found.
[¶65] Second, defense counsel downplayed the significance of the presence of Mr. Winters' DNA on RH's anal swabs, having Ms. Normington admit the amount of DNA was very small, consistent with DNA transfer, and possibly could have occurred from innocuous conduct-Mr. Winters holding RH's hand and RH subsequently scratching his anus.
[¶66] Third, trial counsel's questioning of Ms. Normington led her to concede the testing *213 of RH's penile swabs was inconclusive as to the presence of Mr. Winters' DNA, yet she would expect that had Mr. Winters put RH's penis in his mouth, as RH claimed, Mr. Winters' DNA would be found on RH's penile swabs.
[¶67] Admittedly, trial counsel did not specifically address the DNA found on RH's left hand, most likely because Ms. Normington found the test results were inconclusive as to whether Mr. Winters' DNA was present. And we acknowledge Dr. Miller could have testified, as he did at the Rule 21 hearing, that six out of the six alleles of DNA found on RH's left hand foreign to RH were consistent with Mr. Winters, which would have supported the defense theory that RH himself transferred Mr. Winters' DNA to his anus, especially given that the small amount of DNA found on RH's anal swabs was consistent with DNA transfer. Yet, Dr. Miller also admitted that, applying a similar analysis to the DNA found on RH's penile swabs, three out of three alleles of DNA foreign to RH were consistent with Mr. Winters. In other words, had Dr. Miller testified at trial regarding Mr. Winters' DNA being found on RH's left hand, the State would have elicited on cross-examination that the foreign DNA found on RH's penile swabs was also consistent with Mr. Winters. That would have contradicted Mr. Winters' theory that no sexual contact occurred, and it would have completely undermined the point trial counsel did make with Ms. Normington-if Mr. Winters placed his mouth on RH's penis, as RH contended, you would expect to find Mr. Winters' DNA on the penile swabs, yet his DNA was not found there. It is to this concern which trial counsel testified, "there is a risk in calling just about any expert" as the expert will be subject to cross-examination.
[¶68] Mr. Winters attempts to downplay Dr. Miller's conclusion regarding RH's penile swabs. First, he claims "there is nothing to suggest that defense counsel was aware of this information at the time of trial, so it could not have formed the basis for a decision not to call a DNA expert." That is true; however, it does show Mr. Winters was not prejudiced by counsel's failure to call a DNA expert as the expert would have provided damaging testimony. Second, he claims while Dr. Miller said the DNA present on RH's penile swabs was consistent with Mr. Winters, he also said: "This could be a single source person who just happens to match the two people. And it actually looks more like a single source profile." As Mr. Winters would have it, this testimony shows Dr. Miller to have believed the DNA on RH's penile swabs was from someone other than Mr. Winters. Mr. Winters misreads the testimony. Dr. Miller was correcting the prosecutor who stated there was a mixture of Mr. Winters' and RH's DNA on the penile swabs (even though Dr. Miller had previously stated "it looks like just a small mixture of the two of them"). In any event, while Dr. Miller may have been able to minimize his opinion, the jury still would have heard from him that the DNA found on the penile swabs was consistent with Mr. Winters.
[¶69] We also acknowledge Ms. Normington did not inform the jury that DNA from an unknown person was found on RH's anal swabs (thereby demonstrating DNA was transferred to RH's anus without any sexual contact) or that RH's DNA was not found on Mr. Winters' penile swabs even though RH claimed Mr. Winters rubbed his penis on him. However, that RH was not a contributor to the DNA found on Mr. Winters' penile swabs was contained in her report, which was admitted into evidence. Moreover, as to the additional DNA on the anal swabs, had Dr. Miller been called to testify to that information, the State would have cross-examined him, as it did at the Rule 21 hearing. During that cross-examination, Dr. Miller admitted the additional foreign DNA on RH's anal swabs, which consisted of a few alleles, could be explained by his mother folding the shorts he was wearing, living in the same house with him, or sitting in the same chair as him. According to him, "everybody carries a little bit of foreign DNA on them." At the same time, Dr. Miller would have confirmed that Mr. Winters' DNA was present on RH's anal swabs, stating: "To a scientific degree of certainty, that is Josh Winters' DNA on that anus, unless he has an identical twin." He also would have admitted that although the lab could not reach a conclusion as to whether RH's own DNA was present on his anal *214 swabs, Mr. Winters' DNA was in fact present there. Therefore, while counsel certainly could have called Dr. Miller to testify to the additional DNA on RH's anal swabs and the lack of RH's DNA on Mr. Winters' penile swabs, Dr. Miller would have also emphasized the presence of Mr. Winters' DNA on RH's anal swabs and opined that DNA on RH's penile swabs was consistent with Mr. Winters', which would have hurt his defense. As trial counsel aptly explained at the Rule 21 hearing: "[E]ven if you think you have one point [or two points or three points or four points] that you can bolster [with the testimony of a DNA expert], an experienced [prosecutor] ... is going to get ... the negative things out."
[¶70] Finally, we realize there is something to be said for having an expert testify to matters supporting the defense. But, as trial counsel also stated at the Rule 21 hearing, "it's powerful to get the State's expert to make certain points that would help your case."
[¶71] Mr. Winters relies on Cooper for the proposition that defense counsel should have called an expert. Cooper is distinguishable and does not provide the support Mr. Winters imagines. Mr. Cooper was convicted of aggravated assault and battery based on his shooting at Mr. Kirk two times as Mr. Kirk drove his car toward Mr. Cooper. Cooper , ¶¶ 7, 9, 319 P.3d at 918. Although Mr. Cooper claimed he was acting in self-defense, trial counsel failed to retain an expert to testify about the distance between Mr. Cooper and Mr. Kirk's vehicle at the time the shots were fired. Id. , ¶¶ 21, 23, 319 P.3d at 920. In his Rule 21 motion, Mr. Cooper claimed this failure amounted to ineffective assistance of counsel. Id. , ¶ 9, 319 P.3d at 918. In support of that claim, he identified an expert who would have testified that, based on the trajectories of the bullets, Mr. Cooper's hand was over the hood of Mr. Kirk's vehicle when he fired the shots. Id. , ¶ 26, 319 P.3d at 921. Trial counsel admitted the distance between Mr. Cooper and Mr. Kirk's vehicle was important but claimed to have made a tactical decision to elicit the distance evidence through cross-examination of the State's expert. Id. , ¶ 27, 319 P.3d at 921. The State, however, never called the evidence technician who performed the trajectory analysis and none of the trial witnesses testified concerning the distance based upon the bullets' trajectories. Id. , ¶ 29, 319 P.3d at 921-22. Not only that, trial counsel tried to discuss her own trajectory calculations during closing argument, but the State successfully objected based on a lack of evidence. Id. , ¶ 30, 319 P.3d at 922. We concluded "not only was there no testimony to support the trajectory analysis and establish the actual distances, the lack of evidence was emphasized by defense counsel's improper argument using her own distance calculations rather than those of an expert." Id. , ¶ 31, 319 P.3d at 922. Importantly, we did not hold "that cross examination of the State's expert in lieu of employing an expert is always improper." Griggs , ¶ 40, 367 P.3d at 1125.
[¶72] As with the distance evidence in Cooper , the DNA evidence in this case was certainly important. But, unlike the expert in Cooper , Dr. Miller's testimony would not have been helpful to Mr. Winters as he would have testified the DNA found on RH's penile swabs was consistent with Mr. Winters. Moreover, unlike in Cooper where trial counsel was without an expert to cross-examine because the State never called that expert, the State called its DNA expert and trial counsel not only cross-examined her but did so effectively. Mr. Winters failed to show trial counsel to be deficient in failing to consult with or call a DNA expert or that he was prejudiced as a result.
[¶73] Having resolved all of Mr. Winters' ineffective assistance of counsel claims,[15] we turn now to his claimed trial and sentencing errors, starting with his claim the district court abused its discretion in admitting other acts evidence under W.R.E. 404(b).
*215 B. Rule 404(b)
[¶74] Mr. Winters filed a pretrial demand with the State for notice of its intent to introduce evidence under W.R.E. 404(b). In response, the State filed its notice seeking to introduce evidence that in 1998, when Mr. Winters was 15-years-old, he was convicted in Rhode Island Family Court (juvenile court) of molesting his then 11-year-old adopted sister, KW, and his then five-year-old nephew, JF. In an interview with Rhode Island State Police Detective Brian Casilli, Mr. Winters admitted (1) he had oral sexual activity with his adopted sister; (2) that in 1996-1997, over a period of six weeks, he rubbed his bare penis on her bare vagina until he ejaculated; and (3) he gave her gifts (candy, gum, loose change) in exchange for the sexual contact. He also admitted he touched JF's genitals with his mouth, hands, and penis on multiples occasions in 1998. The State argued admission of this evidence was probative to showing Mr. Winters' motive.[16] Specifically, it claimed that because Mr. Winters denied the sexual abuse occurred and claimed he crossed the river only as part of his rescuing RH, the other acts evidence, which like the charged crime involved underaged children as the victims, was probative to show his motive in crossing the river with RH was sexual gratification.
[¶75] After holding a hearing, the district court decided the evidence was admissible under W.R.E. 404(b). It concluded the evidence was being admitted for the proper purpose of demonstrating motive, the evidence was relevant, and its probative value outweighed its prejudicial effect. In doing so, it considered and weighed each of the factors required by this Court in Gleason v. State , 2002 WY 161, ¶¶ 18, 27, 57 P.3d 332, 340, 342-43 (Wyo. 2002). Relevant here, it found "[i]t is relatively clear that the other acts ... w[ ]ere committed by the Defendant;" "a period in the neighborhood of 20 years has elapsed" between the other acts evidence and the charged crime; and "[t]here are some substantial similarities" between the other acts evidence and the charged crime but "they are not identical." While the court decided the other acts evidence was admissible, it "preclude[d] in limine any reference at trial to the Rhode Island family court's proceedings or evidence of the convictions and/or adjudications" to ensure their confidentiality.
[¶76] At trial, the State presented the testimony of Mr. Casilli. He told the jury allegations were made in 1998 that Mr. Winters, then 15 years old, had molested KW, his 11-year-old adopted sister. Mr. Casilli interviewed Mr. Winters in the presence of his mother. During the interview, Mr. Winters admitted that on five or six occasions in 1997 (when Mr. Winters was 14), over a period of several weeks, he rubbed his bare penis against KW's bare vagina and ejaculated on her stomach and he once rubbed his fingers against her vagina. He also admitted he would give her loose change or candy in exchange for these acts.
[¶77] JF (now 24 years old) also testified at trial. He told the jury that in May 1998, when he was five years old, he told his mother "Me and Josh ... make babies." He also shared with the jury that on one occasion, while he and Mr. Winters were in the basement of a nearby abandoned house, Mr. Winters "used baby oil and rubbed himself on [my genitals] while I was on my back."
[¶78] Mr. Winters argues the admission of this other acts evidence was error in two respects. First, the evidence came from Mr. Winters' Rhode Island juvenile court proceedings, which are confidential and could not be used against him at trial. Second, the other acts evidence is too remote in time and too dissimilar to the current incident to be probative as to Mr. Winters' motive in this case. We start with his latter argument first.
[¶79] Because Mr. Winters' pretrial demand for notice of Rule 404(b) evidence properly preserved his arguments for appeal, our review is for an abuse of discretion. Mayhew v. State , 2019 WY 38, ¶ 23, 438 P.3d 617, 623 (Wyo. 2019). Under that standard, "[a] trial court's rulings on the admissibility of evidence are entitled to considerable *216 deference, and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal." Id . (quoting Swett v. State , 2018 WY 144, ¶ 11, 431 P.3d 1135, 1140 (Wyo. 2018) ). Mr. Winters bears the burden of showing an abuse of discretion. Id .
[¶80] Rule 404(b) provides:
(b) Other crimes, wrongs, or acts. -Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.
Because Rule 404(b) evidence "carries an inherent danger for prejudice," we require a district court to conduct a four-part test to determine its admissibility:
(1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice; and (4) upon request, the trial court must instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.[17]
Gleason , ¶ 18, 57 P.3d at 340 (citing Vigil v. State , 926 P.2d 351, 357 (Wyo. 1996) ).
[¶81] The State sought to admit the other acts evidence at trial as proof of Mr. Winters' motive. Mr. Winters does not dispute that motive is a valid purpose supporting the admission of other acts evidence under Rule 404(b). He claims, however, his motive cannot be inferred from the other acts evidence because the evidence is too remote and dissimilar to the charged crimes.
[¶82] Rule 404(b) allows "evidence of specific instances of conduct to prove 'consequential facts' " such as motive. Gleason , ¶ 17, 57 P.3d at 339 (quoting Virgilio v. State , 834 P.2d 1125, 1128 (Wyo. 1992), and Grabill v. State , 621 P.2d 802, 808 (Wyo. 1980) ). "Motive is generally defined as that which leads or tempts the mind to indulge in a particular act." Swett , ¶ 39, 431 P.3d at 1146 (quoting Brown v. State , 736 P.2d 1110, 1112-13 (Wyo. 1987) ). It is "not an element of any charged crime [but] it is an intermediate fact that the prosecution is permitted to prove." Mayhew , ¶ 31, 438 P.3d at 627 (citing Mitchell v. State , 865 P.2d 591, 596-97 (Wyo. 1993) ). Motive becomes particularly important in child sex abuse cases where the accused denies any wrongdoing, thereby creating an "evidentiary conflict" between himself and the victim. Elliott v. State , 600 P.2d 1044, 1048 (Wyo. 1979) ; see also Griggs , ¶ 131, 367 P.3d at 1143-44 (recognizing "motive to sexually abuse children" as proper use of other acts evidence). As we explained in Elliott , 600 P.2d at 1048-49 :
Given [the] evidentiary conflict [between the victim and Elliott] a finder of fact would be extremely interested in other information that might be available to help resolve the ultimate issue. Evidence of motive would be such information. One who is a paraphiliac, whose preference or addiction for unusual sexual practices occurs in the form of pedophilia, could well be recognized as having a motive to commit the acts complained of by the victim. The fact finder could infer from the acts complained of by the older sister that Elliott was so motivated. Such information would be helpful to any professional in determining whether Elliott was so afflicted. We conclude that on this basis the conduct described by the older sister in her testimony passes the test of relevancy under Rule 404(b), W.R.E., and was admissible for the purpose of proving the motive of the appellant.
*217 See also Brower v. State , 1 P.3d 1210, 1214 (Wyo. 2000) ("When the accused denies any wrongdoing, an evidentiary conflict exists between the victim and the accuser, and evidence of motive assists a jury in resolving the ultimate issue."). In this case, an evidentiary conflict existed as RH claimed Mr. Winters sexually abused him and Mr. Winters denied any sexual contact occurred. Evidence of Mr. Winters' motive would help the jury resolve the conflict.
[¶83] That being said, the other acts evidence still must be relevant and probative to Mr. Winters' motive. Mr. Winters claims the other acts evidence is neither as it is too dissimilar to the charged crimes. He broadly claims "there [are] no factual similarities between the sexual acts of years ago and those charged at trial." Yet, he specifically only identifies two dissimilarities. First, the prior acts involved transgressions when he was a teenager, whereas the charged crimes occurred when he was 33. Second, the prior acts involved different victims, namely a female close to his age (at the time), not a five-year-old boy. In addition to the factors Mr. Winters identifies, there are other obvious differences between the other acts evidence and the charged crimes. KW and JF were Mr. Winters' relatives (albeit not blood relatives); RH was a stranger. The sexual abuse of KW and JF occurred close to home, whereas the sexual abuse of RH occurred in a secluded location while Mr. Winters was working remotely.
[¶84] Despite these dissimilarities, the other acts evidence and the charged crimes both involved a key similarity: Mr. Winters sexually abusing prepubescent children, two of whom were five-year-old boys.[18] As a result, both "involved the same class of victims" and both "reflect [Mr. Winters'] sexual preference for prepubescent children." Mayhew , ¶¶ 35, 438 P.3d at 628. We have consistently upheld the admission of similar other acts evidence in similar circumstances. See, e.g., Mayhew , ¶¶ 3-4, 14, 35-36, 39, 438 P.3d at 619, 628-29 (other acts evidence consisting of photos focusing on the genitals of young girls and videos of young girls thrusting their hips reflected defendant's sexual preference for prepubescent children and was therefore probative of his motive to sexually abuse his granddaughters and a young male and relevant because defendant denied the abuse); Johnson v. State , 872 P.2d 93, 97-98 (Wyo. 1994) (district court did not abuse its discretion in admitting defendant's statement to social worker that he had fondled a ten-year-old girl in Utah in 1984 to prove motive in taking indecent liberties with eight- and ten-year-old sisters in 1989 where defendant denied the crime); Mitchell, 865 P.2d at 593-94, 597-99 (defendant's previous conviction for sexually assaulting a three-year-old girl by inserting a finger inside her vagina and his statement he experienced sexual arousal while doing so were relevant and probative to his motive in charged crime alleging he twice inserted his finger in the vagina of a 10-year old girl where defendant denied the abuse occurred). As in these other cases, the other acts evidence in this case was relevant and probative to establishing Mr. Winters' motive in removing RH from the bowling alley and taking him across the river was sexual gratification.[19]
[¶85] Mr. Winters also claims the other acts evidence is too remote in time (20 years) to be relevant and probative to his motive in this case. We have declined to set an arbitrary time line for the admissibility of Rule 404(b) evidence. Griswold v. State , 994 P.2d 920, 926 (Wyo. 1999) ; abrogated on other grounds by Pena v. State , 2013 WY 4, ¶ 29 n.2, 294 P.3d 13, 18 n.2 (Wyo. 2013) ;
*218 Britton v. State , 845 P.2d 1374, 1376 (Wyo. 1992). As we recognized in Hart v. State , 2002 WY 163, ¶ 25, 57 P.3d 348, 356 (Wyo. 2002), "other courts have admitted evidence of the sexual exploitation of children [occurring] twenty years or more [before the charged crime]." Hart itself involved other acts evidence occurring 26 to 29 years before the charged crime. Id. , ¶ 19, 57 P.3d at 355. The question is whether "the remoteness is so great that the other acts evidence has no value." Id ., ¶ 23, 57 P.3d at 356. That is a matter left to the district court's discretion. Bhutto v. State , 2005 WY 78, ¶ 25, 114 P.3d 1252, 1263 (Wyo. 2005) ; see also Griswold , 994 P.2d at 926 ("The remoteness of the acts does not automatically make the testimony inadmissible; that is a discretionary decision for the trial judge."); Britton , 845 P.2d at 1376 ("Questions concerning remoteness of evidence are left to the sound discretion of the trial court and are subject to challenge only for clear abuse of discretion."). The question is "one of reasonableness" considering "the context in which the evidence was introduced and the theory supporting its admissibility." Hart , ¶ 24, 57 P.3d at 356.
[¶86] In this case, while the district court acknowledged the almost 20-year time gap between the prior acts and the charged crime, it also recognized it was "relatively clear" Mr. Winters committed the other acts. In other words, the evidence was still reliable despite the passage of time. Hart , ¶ 29, 57 P.3d at 358. The court also decided, and we agree, the evidence was probative and relevant to Mr. Winters' motive in this case. As such, we cannot say the court abused its discretion in deciding the other acts to be admissible despite the passage of time. Id . (concluding district court did not abuse its discretion in admitting other acts evidence occurring almost three decades before charged crimes where there was "nothing in the record to suggest that the [other acts evidence] was either stale absolutely, due solely to the passage of time, or stale relatively, because of any events or changes during the intervening period"). Of course, Mr. Winters was free to challenge the weight to be afforded the other acts evidence due to the lapse in time between those acts and the charged crimes. See Griswold , 994 P.2d at 926 ("[R]emoteness may affect the weight of the evidence rather than its admissibility."). He, in fact, did so during his closing argument.
[¶87] Mr. Winters relies on Swett , claiming it tightens the reins on the admission of Rule 404(b) evidence. In that case, Mr. Swett was charged with aggravated child abuse as a result of injuries his son sustained while under his supervision. Swett , ¶¶ 4-7, 431 P.3d at 1139. Mr. Swett admitted he injured the child but claimed he did so accidentally-the child slipped from his arms in the bathtub. Id . Over Mr. Swett's objection, the district court allowed the State to introduce evidence of a physical altercation between Mr. Swett and another inmate while Mr. Swett was in jail awaiting trial in the case. Id. , ¶¶ 16, 19, 431 P.3d at 1141. In that incident, Mr. Swett claimed the other inmate instigated the altercation and implied that the other inmate was hurt when he pushed Mr. Swett, lost his balance, and fell. Id. , ¶ 35, 431 P.3d at 1145. The district court concluded the jail incident was relevant to show Mr. Swett's intent in abusing his son and a lack of accident because, in both the jail incident and the charged crime, Mr. Swett claimed "accident" to diminish his culpability. Id. , ¶ 32, 431 P.3d at 1144. We concluded the district court abused its discretion in admitting the jail incident because it "was not sufficiently similar to the charged [crime] to make it relevant to Mr. Swett's intent or whether [his son's] injuries were the result of an accident," namely, the jail incident and the charged crime involved different victims "who were not similar in any way," different settings, and different excuses-in the jail incident, Mr. Swett denied his actions had caused the other inmate's injuries whereas he admitted he injured his son, but claimed to have done so inadvertently. Id. , ¶¶ 32, 35, 36, 431 P.3d at 1144-45.
[¶88] This case is different. The issue is motive in a child sexual abuse case, not intent or lack of accident in a child physical abuse case. In the latter-type cases, it is important that the other acts evidence and the charged crime be similar in victim or in circumstances as it is these similarities which "make accidental repetition unlikely."
*219 Swett , ¶ 28, 431 P.3d at 1143. To the contrary, when the issue is motive in a child sexual abuse case, the key similarity between the other acts and the charged crime is, as we have already explained, the relationship between the victims and the defendant's actions toward them. In this case, both the victims of Mr. Winters' other acts and the victim in the charged crimes were prepubescent children and both the other acts and the charged crimes involved him using these children for sexual gratification.
[¶89] Mr. Winters' final argument relates to the confidentiality of his juvenile court records. He cites two Rhode Island statutes, but neither was violated in this case. The first, § 14-1-40, states in relevant part: "The disposition of a child or any evidence given in the [Rhode Island Family Court] shall not be admissible as evidence against the child in any case or proceeding in any other court ...." Evidence is "the testimony and matters presented at trial for the purpose of proving a fact in issue." Taylor v. Howard , 111 R.I. 527, 304 A.2d 891, 893 (1973). The district court explicitly prohibited the admission at trial of any evidence of the disposition of Mr. Winters' crime by the Rhode Island Family Court and none was admitted. Moreover, the record from Mr. Winters' Rhode Island Family Court proceedings is not in our appellate record. Therefore, Mr. Winters has failed to show any evidence given in the Family Court proceedings was admitted at trial in this case.
[¶90] The other statute Mr. Winters relies on is § 14-1-64:
All police records relating to the arrest, detention, apprehension, and disposition of any juveniles shall be kept in files separate and apart from the arrest records of adults and shall be withheld from public inspection, but the police report relating to the arrest or detention of a juvenile shall be open to inspection and copying upon request and upon payment of copying costs in accordance with § 38-2-4 by the parent, guardian, or attorney of the juvenile involved. After disposition of an offense and upon execution of an appropriate release and upon payment of copying costs in accordance with § 38-2-4 by the parent, guardian or attorney of the juvenile involved, records relating to the arrest, detention, apprehension and disposition of the juveniles shall be open to inspection and copying by the parent, guardian, or attorney of the juvenile involved.
In this case, the State attached the police records from Mr. Winters' juvenile proceedings, including the transcript of Mr. Casilli's interview of Mr. Winters, to its Rule 404(b) notice. However, the records were filed under seal and were never introduced into evidence at trial. As such, they remained free from "public inspection."
[¶91] We conclude the district court did not abuse its discretion in admitting the Rule 404(b) evidence to prove motive.
C. Insufficiency of the Evidence
[¶92] Mr. Winters was convicted of violating Wyo. Stat. Ann. § 6-2-201 (kidnapping).[20] Relevant here, the statute prohibits one from "unlawfully remov[ing] another from ... the vicinity where he was at the time of the removal ... with the intent to ... [f]acilitate the commission of a felony" and states a "removal ... is unlawful if it is accomplished ... [w]ithout the consent of a parent, guardian or other person responsible for the general supervision of an individual who is under the age of fourteen (14) ...." Section 6-2-201 (a)(ii), (b)(ii). The jury was instructed consistent with the statute.
[¶93] Mr. Winters claims the evidence was insufficient to support his kidnapping conviction. According to him, there was no evidence he "removed" RH from the bowling alley, only that they both went to the same place, the river. He also argues there was insufficient evidence showing he intended to facilitate the commission of a felony "at the time of the removal." Mr. Winters tells us the State's evidence failed to prove beyond a reasonable doubt he had the intent to commit *220 sexual abuse at the time RH left the bowling alley.
[¶94] Our standard of review in deciding claims of insufficient evidence is well-established:
[W]e must decide whether any rational trier of fact could have found that the essential elements of a charged crime were proven beyond a reasonable doubt on the evidence presented. In doing so, we assume that the State's evidence is true, disregard any evidence favoring the defendant, and give the State the benefit of every favorable inference that may reasonably be drawn from the evidence. We will not reweigh the evidence or re-examine witness credibility. Because direct evidence of intent is rare, and circumstantial evidence is most often the only proof available, we have held that intent may be proven by circumstantial evidence alone.
Jones v. State , 2017 WY 44, ¶ 34, 393 P.3d 1257, 1264-65 (Wyo. 2017) (citations omitted). Applying this standard, there was more than sufficient evidence supporting Mr. Winters' kidnapping conviction.
[¶95] "Remove" means "1. [t]o move from a place or position occupied: 2. [t]o transfer or convey from one place to another." Counts v. State , 2012 WY 70, ¶ 47, 277 P.3d 94, 108 (Wyo. 2012). The evidence showed Mr. Winters "moved [RH] from a place or position occupied," i.e., from the bowling alley and then across the river. RH told Ms. Bartle during the first CAP interview that Mr. Winters "stole" him from the bowling alley. He told Officer Hallock he left the bowling alley with the man "that gave him things" and the man "had taken" him by the river to show him his camp. Ms. Brodrecht testified she saw Mr. Winters carrying RH across the river. This evidence shows Mr. Winters and RH did not simply spontaneously arrive at the river, but that Mr. Winters lured RH there and then carried him across the river.[21]
[¶96] To the extent Mr. Winters is claiming there has to be physical contact or force to effectuate a removal, he is mistaken. Nothing in the plain meaning of the word "remove" or the kidnapping statute itself requires such physical contact for purposes of establishing "removal." On the other hand, the statute does require the removal to be "unlawful" and states one way in which a removal is "unlawful" is if it is "accomplished ... [b]y force, threat, or deception." Section 6-2-201 (a)(ii), (b)(i). But the statute also deems a removal "unlawful" if it is "accomplished [w]ithout the consent of a parent, guardian or other person responsible for the general supervision of an individual who is under the age of fourteen (14) ...." Section 6-2-201 (a)(ii), (b)(ii). That was the theory in this case and the State adequately proved it: RH was five at the time and his mother testified she did not know Mr. Winters and did not give him permission to take RH.
[¶97] With respect to Mr. Winters' argument there was insufficient evidence he intended to sexually abuse RH "at the time of the removal," we disagree. "Because direct evidence of intent is rare, and circumstantial evidence is most often the only proof available, we have held that intent may be proven by circumstantial evidence alone." Jones , ¶ 34, 393 P.3d at 1265. The circumstantial evidence of Mr. Winters' intent to sexually abuse RH at the time he removed RH from the bowling alley was substantial.
[¶98] The evidence showed Mr. Winters gave RH money to play video games, claimed to have lost money, and promised RH money if he returned to help him look for the money. RH told Officer Hallock he left the bowling alley with the man who "gave him things" and the man took him to the river to show him the man's camp. Ms. Brodrecht testified Mr. Winters struggled to carry RH across a deep river to a secluded area with lots of bushes and trees. When Ms. Brodrecht asked if they needed help, Mr. Winters told her they were alright and waved her off. A reasonable inference from this evidence is Mr. Winters gained RH's trust at the bowling alley, lured him back to the bowling alley with the promise of money, lured him to the river by telling him he would show him his *221 camp, and deliberately carried RH across the river to a secluded area to sexually abuse him. Moreover, the Rule 404(b) evidence revealed Mr. Winters' motive in removing RH from the bowling alley and carrying him across the river to be sexual gratification. All of this circumstantial evidence, taken together, is more than sufficient evidence to support the jury's finding that Mr. Winters removed RH from the bowling alley and took him across the river with the intent to sexually abuse him.
D. Merger of Sentences
[¶99] As already stated, one of the elements of kidnapping is the unlawful removal of another "with the intent to ... [f]acilitate the commission of a felony." Section 6-2-201. In this case, the district court instructed the jury that to find Mr. Winters guilty of kidnapping, it had to find, inter alia , he unlawfully removed RH "[w]ith the intent to facilitate the commission of a felony, to-wit: sexual abuse of a minor in the first degree or sexual abuse of a minor in the second degree as charged in counts two and three and as defined in Instruction Nos. 18 and 22."
[¶100] Mr. Winters argues that because the jury was told the intent element of kidnapping could be satisfied with the elements of first-degree sexual abuse of a minor, the elements of the latter became elements of the former. Therefore, he tells us each crime does not contain an element different from the other and they are the "same offense" for purposes of sentencing. Consequently, he argues the district court's failure to merge his sentences for these crimes violated double jeopardy under the Fifth Amendment to the United States Constitution and article 1, section 11 of the Wyoming Constitution, both of "which prohibit double punishment for the same offense." Mitchell v. State , 2018 WY 110, ¶ 23, 426 P.3d 830, 837 (Wyo. 2018) ; see also Derrera v. State , 2014 WY 77, ¶ 23, 327 P.3d 107, 113 (Wyo. 2014) (although the Fifth Amendment to the United States Constitution and article 1, section 11 of the Wyoming Constitution contain different language, "they have the same meaning and are co-extensive in application") (quotations omitted). Our review is de novo. Mitchell , ¶ 21, 426 P.3d at 836 (a claim that a sentence is illegal because it "imposes multiple terms of imprisonment for the same offense" is a question of law reviewed de novo).
[¶101] In deciding whether sentences should merge for purposes of double jeopardy, we apply the "same elements" test of Blockburger v. United States , 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). See Webb v. State , 2017 WY 108, ¶ 45, 401 P.3d 914, 929 (Wyo. 2017) ; see also Sweets v. State , 2013 WY 98, ¶ 49, 307 P.3d 860, 875 (Wyo. 2013). Under that test, there is no double jeopardy violation if each crime "requires proof of an element that the other does not." Jones v. State , 2016 WY 110, ¶ 15, 384 P.3d 260, 264 (Wyo. 2016). In so deciding,
we look only to the language used by the legislature to describe the elements which must be proven to bring a particular defendant's specific conduct within the reach of the statute. We do not concern ourselves with how those elements are proven in that defendant's case-that is, we look to what the legislature says must be proven, not the facts or evidence used in a particular case to establish that ultimate fact.
Id. , ¶ 12, 384 P.3d at 264. "[T]he key inquiry is whether the legislative branch intended the defendant's conduct to result in separate offenses and separate punishments-and if the legislature did so intend, then there is no double jeopardy violation." Sweets , ¶ 21, 307 P.3d at 867.
[¶102] The Wyoming legislature has defined sexual abuse of a minor in the first degree to require (1) a defendant at least 16 years of age; (2) sexual intrusion; and (3) a victim under the age of 13. Section 6-2-314(a)(i). It has defined sexual intrusion as "[a]ny intrusion, however slight, by any object or any part of a person's body, except the mouth, tongue or penis, into the genital or anal opening of another person's body if that sexual intrusion can reasonably be construed as being for the purposes of sexual arousal, gratification or abuse" or "[s]exual intercourse, cunnilingus, fellatio, analingus or anal intercourse with or without emission." Wyo. Stat. Ann. § 6-2-301(a)(vii)(A), (B) (LexisNexis 2017). Kidnapping, on the other *222 hand, requires (1) the unlawful removal of another from his place of residence, business, or from the vicinity where he was at the time of the removal (2) with the intent to facilitate the commission of a felony. Section 6-2-201(a)(ii). Relevant here, a removal of an individual under the age of 14 is unlawful if it is accomplished without the consent of the individual's parent. Section 6-2-201(b)(ii).
[¶103] What is clear from the statutory language is that kidnapping and first-degree sexual abuse of a minor each require an element the other does not. In particular, first-degree sexual abuse of a minor requires sexual intrusion, whereas kidnapping does not. That the kidnapping charge in this case referred to the first-degree sexual abuse of a minor charge is of no moment. The jury was not required to find every element of first-degree sexual abuse of a minor to convict Mr. Winters of kidnapping. Rather, it had to find only that Mr. Winters removed RH with the intent to commit first-degree sexual abuse of a minor.
CONCLUSION
[¶104] Because Mr. Winters failed to show trial counsel to be constitutionally ineffective, we affirm the district court's denial of his Rule 21 motion for new trial. We also affirm Mr. Winters' convictions and sentences because the district court did not abuse its discretion in admitting the Rule 404(b) evidence to establish motive, there was sufficient evidence supporting the aggravated kidnapping conviction, and double jeopardy did not require the aggravated kidnapping and first-degree sexual abuse of a minor sentences to be merged.

A surveillance camera from the local water treatment plant captured RH following Mr. Winters south on Wyoming Boulevard. At that time, Mr. Winters was wearing shorts, a blue shirt, and a blue baseball cap. After Mr. Winters left RH on the side of the road, the same surveillance camera captured Mr. Winters running north on Wyoming Boulevard, this time without his hat and shirt. The hat was later found on the side of the road near Fairside Road and Wyoming Boulevard.

Mr. Winters labels his first issue as a failure to challenge RH's competency and credibility. Yet, he makes no specific argument as to how trial counsel failed to challenge RH's credibility other than a conclusory claim that counsel failed to adequately challenge RH's credibility on cross-examination, which we discuss later.

During the second CAP interview, RH told the interviewer: (1) he will be eight on his next birthday, even though he was only five at the time of the interview; (2) his bicycle looks like "fire;" (3) he cannot remember who lives with him; (4) he did not know what he was there to talk about yet also tells her he is there to talk about his family; and (5) the condition of his body on the way to the river was "bad, but his was good." He also denies he was touched anywhere but on his hip. Mr. Winters relies heavily on the second CAP interview to show RH was incompetent to testify. Because we conclude RH's testimony shows him to have been competent to testify and therefore Mr. Winters could not have been prejudiced by the lack of a competency hearing prior to trial, we need not consider the second CAP interview.

Mr. Winters suggests in his briefs the district court erred in not sua sponte holding a pretrial hearing to determine RH's competency to testify and objects to the limited inquiry the court did make prior to RH testifying, as it was not an adequate substitute for a competency hearing. But he correctly conceded at oral argument a district court's obligation to hold a competency hearing is triggered only when a "party presents the court with some evidence that a child witness is incompetent," see English v. State , 982 P.2d 139, 147 (Wyo. 1999), and neither party did so in this case. Indeed, Mr. Winters' whole claim is that trial counsel was ineffective for failing to challenge RH's competency.

RH's mother testified RH lived with her in Wyoming during the summers and with his father and step-mother during the remainder of the year.

Mr. Winters argues nothing in the record suggests RH would have had any personal knowledge of what happened to Mr. Winters after he went to jail or even that he knew Mr. Winters went to jail. Therefore, he tells us this testimony demonstrates RH "was subject to suggestibility from adults." RH also admitted at trial the prosecutor and his mother had spoken to him the day before trial and helped him remember things. As a result, Mr. Winters claims trial counsel was ineffective in failing to request a taint hearing. We decline to consider this argument, which is raised only in a footnote in his opening brief and without any analysis or citation to legal authorities. Duke v. State , 2004 WY 120, ¶ 49, 99 P.3d 928, 946 (Wyo. 2004). As an aside, however, it is ironic that Mr. Winters claims trial counsel was ineffective in not requesting a taint hearing based on this testimony yet argues, with respect to the next issue, "[t]here was no allegation, express or implied at trial that RH had recently fabricated his version of events, or that he had improper influence or motive in his testimony."

Upon discovering RH was not at home, his mother filed a missing child report with the Casper police.

At the time the first CAP interview was played for the jury, it was located on the hard drive of the prosecutor's computer. It was later saved onto a disc and admitted into evidence, again without objection.

During the Rule 21 proceedings, trial counsel offered a strategic reason for not objecting to the admission of the first CAP interview-he believed it would be helpful to Mr. Winters to demonstrate RH "could remember some things very accurately and other things not so accurately." The district court agreed it was "sound trial strategy to allow the jury to hear further evidence related to the consistency or inconsistency of RH's statements." On appeal, Mr. Winters claims if we find trial counsel's failure to object to the first CAP interview to be strategic, then he was ineffective for failing to introduce the second CAP interview, which "contained more contradictions, more evidence of RH's inability to remember events and to truthfully answer questions, and a description of what had occurred on the other side of the river very helpful to the defense," including RH's statement he was only touched on the hip.
We have upheld similar strategic decisions in similar circumstances, see Woods v. State , 2017 WY 111, ¶¶ 13-15, 401 P.3d 962, 968-69 (Wyo. 2017) (concluding counsel's decision to play child victim's forensic interview at trial to show victim's lies and inconsistencies, thereby undermining her credibility, was sound trial strategy in a case where the only evidence of the crime was the victim's story). Nevertheless, because we conclude the district court correctly decided counsel was not deficient in failing to object to the admission of the first CAP interview given it was admissible under the prior consistent statement exception to the hearsay rule, we need not reach the question of whether the failure to object can be justified as strategic. As a result, we need not decide whether counsel was deficient for not offering the second CAP interview as evidence at trial.
To the extent Mr. Winters is attempting to raise a stand-alone claim of ineffective assistance of trial counsel based on counsel's failure to introduce the second CAP interview as evidence at trial, we decline to consider it because it was not specifically raised below and, while trial counsel admitted at the Rule 21 hearing he knew about the second CAP interview, appellate counsel did not ask him to explain his reasons for not offering it at trial. And, the State lost the opportunity to explain RH's performance during the second CAP interview was the result of him having "just a few hours of sleep." Therefore, there is an insufficient record to decide the issue. Cf. Boucher v. State , 2011 WY 2, ¶ 20, 245 P.3d 342, 352 (Wyo. 2011) ("While the pre-arrest delay was significant, the appellant failed to raise that portion of the delay below resulting in an insufficient record to determine its reason and who was responsible for it.").

In deciding trial counsel did not act deficiently in failing to object to the admission of RH's statements to Officer Hallock, the district court alternatively suggested they were admissible because they were not being offered for their truth but rather to show their effect on Officer Hallock and explain why he acted as he did. See Griggs , ¶¶ 85-86, 367 P.3d at 1133-34. As a result, Mr. Winters spends much of his opening brief contesting the district court's reasoning on this point. Because we conclude the statements were properly admitted under the prior consistent statement exception to hearsay and trial counsel was therefore not deficient in failing to object to their admission, we need not reach this argument.

For example, Mr. Winters also complains of trial counsel's failure to conduct pretrial interviews of RH's parents, siblings, friends, daycare providers, and teachers. However, as to these individuals, he claims only that they "would have provided valuable and insightful information about RH and his ability (or inability) to perceive, remember, communicate, and be truthful," in other words, his competency. We have already concluded counsel was not ineffective in failing to challenge RH's competency because his testimony demonstrates he was competent. Additionally, even had these individuals somehow provided information that would have deemed RH incompetent to testify, the result would not necessarily have been different. As trial counsel explained at the Rule 21 hearing, had RH not been allowed to testify due to incompetency, his statements and allegations of abuse would have likely come in a different way and he would have lost his opportunity to cross-examine RH. Moreover, the jury would never have heard RH admit during cross-examination that he "slipped" into the river, which was consistent with Mr. Winters's version of events.
Moreover, trial counsel testified he did not interview RH's parents because he does not find victims' parents to be "very cooperative" and does not "expect to get much" from them. Mr. Winters does not refute this explanation and, in fact, fails to specifically identify what helpful information RH's parents would have provided. See Brock v. State , 2012 WY 13, ¶ 17, 272 P.3d 933, 938 (Wyo. 2012) ("[A]n appellant cannot prove ineffective assistance of counsel for failure to investigate where an appellant fails to identify the favorable evidence or witnesses that additional investigation would have revealed.").

In Story v. State , 721 P.2d 1020, 1043 (Wyo. 1986), we concluded "it was misconduct for the prosecutor to instruct the witnesses" not to talk to anyone, including defense counsel, without his approval. It is unclear whether the prosecutor in this case so instructed RH because trial counsel was testifying only to his "past attempts" to interview victims. In any event, Mr. Winters does not claim the prosecutor in this case told RH he could not speak with trial counsel so the issue is not before us.

In addition to King , Mr. Winters relies on Asch and Gist for the proposition that prejudice is presumed when counsel fails to interview an eye-witness. Neither case, however, stands for that proposition. In Gist , we decided defense counsel acted deficiently in not interviewing Mr. Gist's brother because Mr. Gist claimed it was his brother, not him, who committed the charged crime and his brother later confessed to the crime. Gist , 737 P.2d at 339, 343. Importantly, we concluded the deficiency prejudiced Mr. Gist, not because prejudice was presumed but because had his brother testified at trial consistent with his confession, "[Mr.] Gist's chances of acquittal would have been materially enhanced." Id . at 343. Similarly, Asch involved counsel's failure to review the arresting officer's preliminary hearing testimony or use it to impeach him on cross-examination, even though the officer's view of what he saw in the vehicle was the only proof that Mr. Asch, rather than his co-defendant, possessed the methamphetamine found in the vehicle. Asch , ¶ 44, 62 P.3d at 959. In other words, the case involved a failure to effectively cross-examine a key witness. While we relied on King to decide prejudice was presumed in such circumstances, id , ¶ 45, 62 P.3d at 959, Asch is factually and legally inapplicable to the issue presented here.

Trial counsel explained it this way: "[A] gram is a Sweet & Low packet. ... Now a nanogram is a billionth ... of a gram. ... They didn't even find a nanogram. They found 0.000337 [of a nanogram]."

Mr. Winters suggests the individual errors of counsel, taken together, amount to cumulative error. "In conducting a cumulative error evaluation, we consider only matters that we have determined to be errors." Guy v. State , 2008 WY 56, ¶ 45, 184 P.3d 687, 701 (Wyo. 2008). Because we found no errors, there can be no cumulative effect.

The State also argued, and the district court concluded, the prior acts evidence was relevant to show intent and lack of mistake or accident. Because we conclude the evidence was admissible to show motive, we need not address intent or lack of mistake or accident.

Mr. Winters requested a limiting instruction at the beginning of Mr. Casilli's testimony. The district court complied with that request and reminded the jury of the instruction prior to JF testifying. The court also included the limiting instruction in its closing instructions to the jury. Mr. Winters does not challenge the instruction in this appeal.

Mr. Winters claims we do not know how old JF was at the time of the abuse because he testified only that he disclosed the abuse to his mother when he was five. But JF testified he was five years old when he reported the abuse to his mother and his report was in the present tense, "[Josh and I] make babies." (Emphasis added). We can infer from his testimony the abuse occurred when he was five.

We acknowledge that in these other cases both the other acts evidence and the charged crime involved adult defendants victimizing prepubescent children. And, as Mr. Winters points out, the other acts evidence in this case involved acts he committed when he was 14 and 15 and the charged crimes occurred when he was 33. But, contrary to Mr. Winters claim at oral argument, the other acts evidence did not involve "child on child." Rather, at 14- and 15-years-old, he was no longer prepubescent.

Mr. Winters was actually convicted of aggravated kidnapping because the jury found Mr. Winters did not voluntarily release RH substantially unharmed and in a safe place prior to trial. See Wyo. Stat. Ann. § 6-2-201(d). Mr. Winters does not contest this finding on appeal.

That RH testified he "slipped" into the river does not alter this result. The jury could have inferred from the evidence that even if Mr. Winters initially went in the water to help RH, he could have simply pulled him to shore rather than carry RH across the river.