# IN THE SUPREME COURT, STATE OF WYOMING

# 2021 WY 82

APRIL TERM, A.D. 2021

July 8, 2021

NICHOLAS J. JENDRESEN,

Appellant
(Defendant),

v.

S-19-0154, S-20-0244

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Campbell County*
*The Honorable John R. Perry, Judge*

*Representing Appellant:*

Office of the Public Defender: Diane M. Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Professor Lauren McLane, Faculty Director, Cameron Smith, Student Intern, of the Defender Aid Clinic, University of Wyoming, College of Law. Argument by Mr. Smith.

*Representing Appellee:*

Bridget L. Hill, Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Catherine M. Mercer, Assistant Attorney General. Argument by Ms. Mercer.

*Before FOX, C.J., and DAVIS\*, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

*\* Chief Justice at time of oral argument.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Chief Justice.**

[¶1]    When police contacted Nicholas Jendresen in response to allegations of sexual abuse of a minor, he had trashed his apartment and stripped naked.  He then ran screaming outside into the snow.  He was arrested and taken to the hospital where he confessed to the crime.  He confessed again in jail a few days later.  Arguing he did not knowingly and intelligently waive his *Miranda* rights, he filed a motion to suppress the statements which the district court denied.  After a bench trial, the district court found him guilty of four counts of sexual abuse of a minor.  He appealed and filed a W.R.A.P. 21 motion, which the district court denied.  He appeals that decision, and we consolidate his appeals.  We affirm.

## *ISSUES*

[¶2]    We rephrase and consolidate the issues:

> I.    Did the district court err when it found Mr. Jendresen knowingly and intelligently waived his *Miranda* rights?
>
> II.   Was Mr. Jendresen's trial counsel ineffective:
>
>> A.    for failing to supply his trial expert with video evidence?
>>
>> B.    for stipulating that the experts' motion hearing testimony on his psychological evaluations could be admitted at trial?
>>
>> C.    for various additional omissions he raises in this appeal?
>
> III.  Did Mr. Jendresen's trial counsel's actions cumulatively prejudice him?

## *FACTS*

[¶3]    On Christmas Eve, 2016, Nicholas Jendresen confessed to his brother-in-law, Arlin Price, that he had been touching his six-year old daughter, I.J., "in her private areas."  Mr. Price advised Mr. Jendresen to tell his wife, and the next evening Mr. Jendresen did so.  Mrs. Jendresen gathered the couple's children and took them to Mr. Price's nearby apartment.  Mr. Price called the Gillette Police Department.  He

1

reported what Mr. Jendresen had disclosed and that Mr. Jendresen was alone in his apartment, with firearms, and potentially suicidal.

[¶4]    Corporal Jay Johnson responded, along with five or six other officers, most of whom were recording with their body cameras.  Corporal Johnson made contact with Mr. Price in his apartment building.  Two other officers encountered Mr. Jendresen walking out of his apartment into the hallway, naked.  They commanded him to show his hands so they "could see that he had no weapons" and to lie down on the floor.  He complied at first, but then slipped past the officers, who tasered him at least twice; he ran down a flight of stairs; and out the door where he was tackled in the snow.  The officers cuffed him and dragged him back into the apartment building.  As they did so, Mr. Jendresen repeatedly said, and at times screamed, "I love everyone."

[¶5]    Mr. Price arrived and told Mr. Jendresen to "calm down" and to "quit screaming and yelling," which he did.  Mr. Jendresen continued to mumble strange statements and tell everyone that he loved them, but he also answered several questions clearly, and told the officers where they could find pants, shoes, and a blanket in his apartment.  EMTs arrived and asked him what was going on, and he answered, "I was a bad man [unintelligible].  . . .  I was being a bad man.  And it . . . it hurt . . . my daughter."

[¶6]    In the ambulance, Mr. Jendresen had difficulty answering some questions, such as his age, although he knew his birthdate.  He made odd comments, apologized to the officers, and he sang quietly to himself.  At the hospital, officers handcuffed him to the bed rails.  Mr. Jendresen was able to reply to a nurse's basic medical questions, but he could not list his medications, and when the nurse asked him why he took medication, he responded, "because I love you."  Officer Dillard later testified that Mr. Jendresen's mental state at the hospital was "much different than that of the individual we were wrestling with."  When Mr. Jendresen, who was by then calm, began to make incriminating statements, Officer Dillard asked Corporal Johnson to come to the hospital.

[¶7]    At the time, Corporal Johnson was searching the Jendresen apartment for physical evidence of the alleged abuse.  He found the apartment in complete disarray, although Mrs. Jendresen reported the apartment had been picked up and clean when she left.

**Confession**

[¶8]    Corporal Johnson arrived at the hospital and advised Mr. Jendresen of his *Miranda* rights.  Mr. Jendresen indicated he understood by nodding.  Corporal Johnson asked Mr. Jendresen to clarify the statements he had reportedly made to Mr. Price about sexually touching his daughter.  He asked, "Are you talking—touching her on her cheeks, touching her on the shoulders, touching on her butt, touching her on her breasts, her stomach, did you touch her vagina?  What are you talking about?"  Mr. Jendresen responded that he touched "the one bad thing," and then confirmed that he had touched

2

her vagina in a sexual way. He said the abuse began when his daughter was in diapers, and happened five to ten times in a number of locations, and at least four times since the family had moved to Gillette, months earlier.

[¶9] Mr. Jendresen described the sexual abuse in detail and his thoughts at the time. Mr. Jendresen also described, in detail, the events leading up to his hospitalization, including the disclosures he made to his brother-in-law and wife, trashing his apartment, stripping naked, and walking out into the hallway and seeing the officers.

[¶10] A few days later, while in jail, Mr. Jendresen asked Corporal Johnson to come and speak with him. He was advised of his rights and confessed again in detail, acknowledging that in the hospital he had already "let the cat out of the bag, so to speak."

**I.J.'s Forensic Interview**

[¶11] A forensic interviewer for the Children's Home Child Advocacy Center of Rapid City, South Dakota, met with I.J. I.J.'s interview largely corroborated Mr. Jendresen's confession.

**Competency Evaluations**

[¶12] The State charged Mr. Jendresen with three counts of first-degree sexual abuse of a minor and one count of second-degree sexual abuse of a minor under Wyo. Stat. Ann. §§ 6-2-314 and 6-2-315. Mr. Jendresen's court-appointed attorney filed a motion in the circuit court to have Mr. Jendresen evaluated for his fitness to proceed pursuant to Wyo. Stat. Ann. § 7-11-303(b) and (c). Dr. Laura McCormick, a forensic examiner from the Wyoming State Hospital, met with Mr. Jendresen and filed a report finding him not fit to proceed due to depression. She recommended inpatient restoration treatment, so the circuit court sent him to the State hospital. A month later, Dr. Katherine Mahaffey, a different forensic psychologist for the State, evaluated Mr. Jendresen and filed a report finding him competent to proceed. The case was bound over to the district court, where Mr. Jendresen was arraigned and pled not guilty to all charges.

[¶13] Mr. Jendresen filed a Motion to Enter Plea of Not Guilty by Reason of Mental Illness (NGMI) and a Motion for a Psychological Evaluation, Criminal Responsibility pursuant to Wyo. Stat. Ann. § 7-11-304. Mr. Jendresen's counsel later explained that the NGMI defense was not part of his ultimate trial strategy, but a way to obtain further evaluations, which might support his theory that Mr. Jendresen's bizarre behavior on the night of the arrest indicated he may not have been capable of knowingly and intelligently waiving his *Miranda* rights.

[¶14] Dr. Mahaffey evaluated Mr. Jendresen again for the purposes of the NGMI defense. Based on what she felt was suspicious endorsement and exaggeration of a wide

constellation of symptoms, particularly his reported inability to remember the abuse or his confessions, Dr. Mahaffey diagnosed him with malingering and several other disorders. But her report found Mr. Jendresen "did not suffer from a mental illness or mental deficiency so severely abnormal as to have grossly and demonstrably impaired his perception or understanding of reality," and stated "with a reasonable degree of psychological certainty" that "Mr. Jendresen did not lack substantial capacity, as a result of mental illness or deficiency, either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." (Emphasis omitted.)

[¶15] Mr. Jendresen's counsel requested a second opinion from Dr. Trent Holmberg, a forensic psychiatrist. Counsel sent Dr. Holmberg the police reports and thousands of pages of Mr. Jendresen's medical, military, and mental health records, but did not send the officers' body cam videos of the arrest and confessions, because he felt Mr. Jendresen's behaviors on that night were "well documented" in the police reports. Dr. Holmberg examined Mr. Jendresen, and filed a report expressing concerns about his competence at the time of the confessions. Dr. Holmberg opined that Mr. Jendresen confessed amidst an acute psychotic episode and may not have knowingly and intelligently waived his rights.

**Motion to Suppress**

[¶16] Mr. Jendresen filed a motion to suppress his confessions. The district court held a hearing in January 2019, during which both experts testified remotely. Dr. Holmberg opined that Mr. Jendresen was, more likely than not, acutely psychotic and lacking contact with reality when he confessed at the hospital. He supported his conclusion with information from the police reports about the condition of the Jendresen apartment and Mr. Jendresen's behavior throughout the night. He also opined that Mr. Jendresen had a lingering thought disorder, disconnection with reality, or mood episode that did not resolve until weeks after he was arrested.

[¶17] Dr. Holmberg discussed Mr. Jendresen's reported lack of memory of the events of late December, which he asserted was a common symptom in patients after a period of psychosis. Dr. Holmberg referred to evidence in Mr. Jendresen's records that he had had other psychotic or dissociative episodes in 2007, 2009, and May 2016, each time reporting amnesia afterward. He opined that Mr. Jendresen's inability to remember the December 2016 incident was likely an indication of actual memory loss, not malingering.

[¶18] Dr. Holmberg had not viewed any of the videos because they had not been provided to him. Nevertheless, Dr. Holmberg answered several of the court's questions about how it should view Mr. Jendresen's seemingly competent demeanor while he was at the hospital. He explained that, even if Mr. Jendresen's answers seemed cogent and linear, it was possible the answers were based on delusions rather than reality; that the court could not assume Mr. Jendresen was oriented as to time and place unless he was

4

asked about his awareness of his surroundings directly; and that detailed answers were not necessarily more true than short answers. He also explained that the court could not take Mr. Jendresen's indication that he understood his constitutional rights at face value, but should look for "some evidence that he demonstrated an understanding and didn't just say he had an understanding," because statements by someone who is acutely psychotic may be true or false.

[¶19] Dr. Mahaffey testified that she did not think Mr. Jendresen was in the midst of a psychotic episode when he confessed, and that his demeanor was not consistent with someone having a psychotic break. She stated she did not see the evidence of the hallucinations, delusions, disorganization, or inability to communicate that Dr. Holmberg discussed. She pointed instead to the fact Mr. Jendresen engaged in metacognition (thinking about his thinking) when he talked about his "warped thinking" at the time of the alleged abuse, and when he said that "in his current state he would beat himself up" for what he had done. She also pointed to the fact he was tracking the conversation, responding appropriately to each question, elaborating, engaging his short and long-term memory, and was able to remember previous conversations and compare what he told his wife with what he told the officers. Dr. Mahaffey opined that Mr. Jendresen was engaging in cognitive distortions common to offenders, such as his belief his daughter liked the abuse, "that she presented as suggestive, that he wanted it to stop but that he was trying to get the child to stop it, so viewing them as more of an adult than in fact they are . . . ." She also told the court it was important that I.J. corroborated the abuse in her forensic interview because "[i]t goes to the trustworthiness of the defendant's statements to law enforcement. Kind of validates that it's based in reality."

[¶20] Dr. Mahaffey's opinion was that if Mr. Jendresen had a psychotic episode, that it was very brief, perhaps only moments. She said Mr. Jendresen's behavior at his apartment was more likely the product of the stress of seeing his wife and kids walk out of his life. She testified that she had administered a test that screens for malingering, and that Mr. Jendresen's results strongly suggested he was feigning symptoms. She said she found Mr. Jendresen's statements about having hallucinations the night of the arrest suspicious. She also testified that Mr. Jendresen "acknowledged feigning some of his memory loss" when he described events that he had recently claimed he could not remember. She had heard all of Dr. Holmberg's testimony, but Dr. Holmberg signed out of the hearing after he testified, and he was not called back for a rebuttal. Unlike Dr. Holmberg, Dr. Mahaffey had viewed the video of Mr. Jendresen's hospital confession.

[¶21] After her cross-examination and the redirect examination, Dr. Mahaffey told the court she had "some concerns." She then gave several minutes of uninterrupted explanation of her diagnoses. At no point during her narrative did Mr. Jendresen's counsel object.

5

[¶22] The parties offered the body cam videos into evidence for the court to view after the hearing. The district court found Mr. Jendresen waived his *Miranda* rights "voluntarily, knowingly, and intelligently," and denied his motion to suppress the statements.

**Trial**

[¶23] Mr. Jendresen proceeded to a bench trial in February 2019, on the theory that his confession was unreliable due to his mental state, and that the State had insufficient corroborating evidence of his charges. He stipulated the State could play his daughter's forensic interview instead of requiring her to testify. The court heard testimony from I.J.'s forensic interviewer, three police officers, and Mr. Jendresen's wife and brother-in-law. Mr. Jendresen stipulated that the court could use the suppression hearing testimony from the experts for its determination of the reliability of his confessions.

[¶24] At the close of trial, the district court reiterated Mr. Jendresen's statements "were voluntarily made with an understanding of his rights as per *Miranda*." The court noted that the confession did not begin with the involvement of law enforcement, but when Mr. Jendresen unburdened himself to his brother-in-law. The court found his "seemingly imbalanced actions" when law enforcement encountered him were more likely the result of his overwhelming guilt and distress than psychosis. The court considered both experts' testimony, but placed greater weight on Dr. Mahaffey's opinion, in part, because Dr. Mahaffey had viewed the videos, while Dr. Holmberg had not. The court also accepted Dr. Mahaffey's conclusion "that the defendant was attempting unsuccessfully to malinger." The court then turned to the issue of guilt, and found I.J.'s forensic interview and Mr. Jendresen's disclosures to his wife and brother-in-law corroborated the confession. The district court found him guilty on all four counts.

[¶25] Mr. Jendresen was sentenced to fifteen to thirty years of incarceration on each count of first-degree sexual abuse of a minor and ten to twenty years of incarceration on the count of second-degree sexual abuse of a minor, with all sentences to run concurrently. He appealed the trial verdict.

**Rule 21 Motion**

[¶26] Mr. Jendresen then filed a motion in the district court claiming ineffective assistance of counsel under W.R.A.P. 21(a), and his trial appeal was stayed. He argued that his Sixth Amendment right to effective assistance of counsel was violated; first, because his counsel failed to provide Dr. Holmberg with the videos before the suppression hearing; and, second, because counsel violated his statutory rights under Wyo. Stat. Ann. § 7-11-303(h) and -304(h) and his Fifth Amendment right against self-incrimination by stipulating to the admission of suppression hearing testimony of the

6

experts at trial. He claimed the statements he made during his mental health evaluations were used against him as substantive evidence of his guilt.

[¶27] In April 2020, the district court held a virtual hearing in which Mr. Jendresen's trial counsel and Dr. Holmberg testified. Dr. Holmberg explained how the videos would have strengthened his testimony at the suppression hearing, and he took the opportunity to rebut many of Dr. Mahaffey's opinions, particularly her opinion that Mr. Jendresen was malingering. However, the district court found Dr. Holmberg's testimony after watching the videos did not fundamentally change, and the court stated it did not use any of the information from Mr. Jendresen's competency evaluations to determine his guilt at trial. The district court concluded Mr. Jendresen benefitted from effective assistance of counsel. We include further detail as necessary in the discussion.

## DISCUSSION

[¶28] Mr. Jendresen argues that his *Miranda* waiver was not knowing and intelligent because he was psychotic on the night of December 26, 2016, therefore the confession should not have been admitted. He then contends that his counsel was ineffective in various respects. We first address the *Miranda* waiver.

### I.    Mr. Jendresen Voluntarily Waived His Miranda Rights

[¶29] We review the district court's findings of fact on a motion to suppress for clear error. *Schwartz v. Wyoming*, 2021 WY 48, ¶ 9, 483 P.3d 861, 864 (Wyo. 2021) (citing *Rodriguez v. State*, 2018 WY 134, ¶ 15, 430 P.3d 766, 770 (Wyo. 2018)). We view the evidence in the light most favorable to the district court's decision because it had the opportunity to "assess the credibility of the witnesses, weigh the evidence, and make the necessary inferences, deductions, and conclusions." *Rodriguez*, 2018 WY 134, ¶ 15, 430 P.3d at 770. We review the district court's conclusions of law de novo. *Schwartz*, 2021 WY 48, ¶ 9, 483 P.3d at 864. Voluntariness is a question of law which we review de novo. *Bhutto v. State*, 2005 WY 78, ¶ 11, 114 P.3d 1252, 1257 (Wyo. 2005) (citing *Lewis v. State*, 2002 WY 92, ¶ 18, 48 P.3d 1063, 1068 (Wyo. 2002)).

[¶30] The rights recognized in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) protect "defendants against government coercion leading them to surrender rights protected by the Fifth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986).[1] Statements made during a custodial interrogation are therefore inadmissible unless the suspect in custody is advised

---

[1] The related but distinct question of the voluntariness of the confession arises from the Due Process Clause of the Fourteenth Amendment. *Connelly*, 479 U.S. at 163-64, 107 S.Ct. at 519-20. Mr. Jendresen raises only his Fifth Amendment *Miranda* rights in this appeal.

of his constitutional rights. *Rodriguez*, 2018 WY 134, ¶ 27, 430 P.3d at 772 (citing *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612). However, advising a suspect of his *Miranda* rights alone does not make a confession admissible. *Bhutto*, 2005 WY 78, ¶ 11, 114 P.3d at 1258. A *Miranda* waiver must be "made voluntarily, knowingly and intelligently." *Solis v. State*, 851 P.2d 1296, 1299 (Wyo. 1993) (quoting *Frias v. State*, 722 P.2d 135, 142 (Wyo. 1986)).

> A statement is not "compelled" within the meaning of the Fifth Amendment if an individual "voluntarily, knowingly and intelligently" waives his constitutional privilege. *Miranda v. Arizona*, [384 U.S.] at 444, 86 S.Ct. at 1612. The inquiry whether a waiver is coerced "has two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986):
>
>> "First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Ibid.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979)).

*Colorado v. Spring*, 479 U.S. 564, 573, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987); *see also Frias*, 722 P.2d at 141-42; *Berghuis v. Thompkins*, 560 U.S. 370, 382, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010). The State bears the burden of proving both prongs by a preponderance of the evidence. *Solis*, 851 P.2d at 1299 (citing *Connelly*, 479 U.S. 157, 107 S.Ct. 515).

[¶31] It is undisputed Mr. Jendresen was in custody when he confessed and that he was advised of his *Miranda* rights each time. Mr. Jendresen does not argue the police coerced him at any point.[2] His only argument is that his waiver was not knowing and intelligent

---

[2] The United States Supreme Court emphasized that the coercion *Miranda* protects against is governmental coercion. In *Connelly*, the United States Supreme Court reversed the Colorado Supreme Court's decision affirming the suppression of Mr. Connelly's statements. The Colorado court relied on a

because of his mental state. We turn then to the second prong – Mr. Jendresen's awareness, both of the nature of the right being abandoned, and the consequences of the decision to abandon it.

> The second inquiry under the *Frias* test is whether Appellant was sufficiently aware of the nature of the right being abandoned and the consequences of his decision to abandon that right. No bright line test exists for determining when a defendant sufficiently comprehends his rights to effectuate a valid waiver. Each defendant's waiver must be analyzed in light of his particular background, experience, and conduct. *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). The constitution does not require that a defendant know and understand every possible consequence of a waiver of the Fifth Amendment privilege. *Colorado v. Spring*, 479 U.S. 564, 574, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987).

*Solis*, 851 P.2d at 1299.

[¶32] The district court found, based on "all of the evidence presented at the hearing and through the video recordings," that Mr. Jendresen "did have awareness of the nature of his *Miranda* rights and . . . understood sufficiently the consequences of his decision to waive those rights." The evidence showed:

- The *Miranda* warning was read relatively fast, but not so quickly as to not be understandable.

- Mr. Jendresen indicated he understood his rights with a nod.

- He did not appear to be out of control, or even agitated at the hospital, as he had at the apartment building, but was calm and paying attention to Corporal Johnson.

---

psychiatrist's testimony that Mr. Connelly "was not capable of making a 'free decision with respect to his constitutional right of silence . . . and his constitutional right to confer with a lawyer before talking to the police.'" 479 U.S. at 169, 107 S.Ct. at 523 (citation omitted). But the Court held "*Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that. Respondent's perception of coercion flowing from the 'voice of God,' however important or significant such a perception may be in other disciplines, is a matter to which the United States Constitution does not speak." *Connelly*, 479 U.S. at 170-71, 107 S.Ct. at 523-24.

9

- When asked about his physical condition, he responded appropriately, saying, "I hurt" and "obviously I'm naked," and "I'm not mad."

- He answered with a simple "yes" to several of Corporal Johnson's questions, but he also elaborated at times. For example, when asked whether the last occurrence of abuse was days or weeks in the past, Mr. Jendresen shook his head and said, "months."

- He gave details about the abuse, he specified how many times it happened, and he listed the different states where the family had lived when it happened.

- He explained his thinking during the abuse.

[¶33] Mr. Jendresen complains the district court erred in reaching this conclusion because it "relied entirely" on Dr. Mahaffey's testimony and it "did not look at the totality of the circumstances." He complains that his expert's testimony–that Mr. Jendresen would have had trouble understanding and waiving his rights intelligently because he was acutely psychotic and lacking contact with reality at the time–was disregarded by the district court. The record shows the district court looked beyond Dr. Mahaffey's testimony and considered the circumstances surrounding Mr. Jendresen's decision to confess, particularly his brother-in-law's admonition to come clean. The district court did place greater weight on Dr. Mahaffey's opinion, but "[w]hen a district court is faced with conflicting expert reports, it 'does not clearly err simply by crediting one opinion over another where other record evidence exists to support the conclusion.'" *Fletcher v. State*, 2010 WY 167, ¶ 20, 245 P.3d 327, 333 (Wyo. 2010) (quoting *Battle v. United States*, 419 F.3d 1292, 1299 (11th Cir. 2005)).

[¶34] The district court's findings of fact were not clearly erroneous. As a matter of law, the court correctly applied the facts and concluded Mr. Jendresen was aware of the nature of the right to remain silent and the consequences of his decision to abandon that right.

## II. *Ineffective Assistance of Counsel*

[¶35] At his Rule 21 hearing, Mr. Jendresen asserted his trial counsel was deficient for failing to provide the police body cam videos to his expert witness, and for stipulating to the use of his psychological evaluations at trial. On appeal, he raises various other omissions, and he claims the cumulative effect of his counsel's failures caused him prejudice.

## STANDARD OF REVIEW

[¶36] Ineffective assistance of counsel claims "involve mixed questions of law and fact." *Sides v. State*, 2021 WY 42, ¶ 34, 483 P.3d 128, 137 (Wyo. 2021) (citing *Mellott v. State*, 2019 WY 23, ¶ 11, 435 P.3d 376, 381 (Wyo. 2019)). We review the district court's findings of fact for clear error and its conclusions of law de novo. *Sides*, 2021 WY 42, ¶ 34, 483 P.3d at 137.

## Mr. Jendresen's Trial Counsel Provided Effective Assistance

[¶37] "A criminal defendant has the right to the effective assistance of counsel." *Shields v. State*, 2020 WY 101, ¶ 44, 468 P.3d 1097, 1109 (Wyo. 2020) (citing U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984)). To prevail on an ineffective assistance claim, the appellant bears a two-part burden. *Sides*, 2021 WY 42, ¶ 33, 483 P.3d at 137. First, the appellant must "show that his attorney's performance 'was substantially below that of a reasonably competent attorney.'" *Lewis v. State*, 2020 WY 110, ¶ 18, 470 P.3d 564, 569-70 (Wyo. 2020) (quoting *Byerly v. State*, 2019 WY 130, ¶ 67, 455 P.3d 232, 250 (Wyo. 2019)). Second, he must show "that, absent the deficiency, a reasonable probability exists that he would have enjoyed a more favorable outcome." *Lewis*, 2020 WY 110, ¶ 18, 470 P.3d at 570. We adhere to the "strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable judgment." *Neidlinger v. State*, 2021 WY 39, ¶ 53, 482 P.3d 337, 352 (Wyo. 2021). We examine counsel's actions "under the circumstances existing at the time of the challenged act or omission and from the perspective available" then, not in hindsight. *Dixon v. State*, 2019 WY 37, ¶ 56, 438 P.3d 216, 236 (Wyo. 2019) (quoting *Wall v. State*, 2019 WY 2, ¶ 39, 432 P.3d 516, 527 (Wyo. 2019)). We determine only "whether [counsel's] actions could be considered sound trial strategy." *Dixon*, 2019 WY 37, ¶ 56, 438 P.3d at 236 (alteration in original) (quoting *Luftig v. State*, 2010 WY 43, ¶ 18, 228 P.3d 857, 865 (Wyo. 2010)). We may dispose of an ineffective assistance claim solely on the prejudice prong. *Sides*, 2021 WY 42, ¶ 34, 483 P.3d at 137; *Lewis*, 2020 WY 110, ¶ 18, 470 P.3d at 570.

## A.     The Videos

[¶38] Mr. Jendresen claims his counsel's failure to provide his expert with the videos deprived him of relevant evidence and undermined his credibility. At trial, the district court stated it found Dr. Holmberg a competent psychiatrist, and it considered his opinions carefully. Yet the district court gave Dr. Mahaffey's opinion more weight, in part because she had viewed the hospital confession video while Dr. Holmberg had not, and, in part, because her opinion provided "greater and more encompassing detail." The court also commented that "Dr. Mahaffey approached the totality of defendant's circumstances from a forensic standpoint rather than a clinical standpoint." Mr. Jendresen concludes from the latter comments that the district court disregarded

Dr. Holmberg's testimony. He further argues that his trial counsel failed to mitigate the situation because he did not ask Dr. Holmberg to stay on the line in order to rebut Dr. Mahaffey's opinion, and, finally, he failed to call Dr. Holmberg to testify at trial.

[¶39] At the Rule 21 hearing, trial counsel testified that his failure to give Dr. Holmberg the videos was not strategic, it simply did not cross his mind. He also testified that after Dr. Holmberg hung up, he did not call him back to rebut any of Dr. Mahaffey's testimony then or at the subsequent trial because he "felt like it was very clear what Dr. Holmberg's position was and why he reached the conclusions that he reached." Dr. Holmberg testified in great detail at the Rule 21 hearing after he viewed the videos. In his lengthy, unrebutted testimony, he used the videos to draw the court's attention to several facts which further supported his ultimate opinion. Yet, as the district court recognized, Dr. Holmberg's opinion did not change substantially after he watched the videos.

[¶40] Dr. Holmberg discussed numerous facts from the videos that supported his underlying opinions, such as: Mr. Jendresen endured a psychotic break from reality that began before he was *Mirandized* and lasted well beyond the December 26th incident; he had previous psychotic breaks; Mr. Jendresen had a thought disorder throughout the arrest and confessions; and Mr. Jendresen endorsed psychotic symptoms such as hallucinations and hearing voices. Dr. Holmberg also took the opportunity to reiterate and strengthen his responses to questions the district court had asked in the suppression hearing, and to rebut Dr. Mahaffey's opinions, particularly on the issue of malingering. Dr. Holmberg explained his belief that Dr. Mahaffey's malingering diagnosis concerned Mr. Jendresen's behavior at the time of evaluation, more than a year after his arrest, and was therefore not relevant to his condition at the time of his confession. He added that, while Dr. Mahaffey had seen the hospital confession video, there was much that she did not see, including the video from the emergency room, the video of the jail interview, and his jail medical records. Finally, Dr. Holmberg testified that watching the videos strengthened his opinion that Mr. Jendresen did not knowingly and intelligently waive his *Miranda* rights.

[¶41] Yet, he also testified that his opinion changed "slightly" after having watched the videos. As he described the opinion he gave at the suppression hearing, "I had expressed skepticism that it – about it and thought that it was a red flag, but I did not opine that he was unable to waive his *Miranda* rights competently." After reviewing all the videos, his opinion was "it was unlikely [Mr. Jendresen] was able to competently waive his *Miranda* rights." There is no meaningful difference between his earlier and later opinions. The district court correctly concluded "[f]undamentally, Dr. Holmberg's opinion does not change," and the information he added at the Rule 21 hearing were facts largely available to him from the police reports, which he had at the time of the suppression hearing.

[¶42] Because giving Dr. Holmberg the videos would not have resulted in a different outcome, we find his counsel's failure to do so did not result in prejudice. Therefore, we

do not determine whether this act was "outside the wide range of professionally competent assistance." *Shields*, 2020 WY 101, ¶ 44, 468 P.3d at 1110 (quoting *Winters v. State*, 2019 WY 76, ¶ 12, 446 P.3d 191, 199 (Wyo. 2019)).

## B. Stipulating to the Experts' Suppression Hearing Testimony

[¶43] At the suppression hearing, the two State forensic examiners and Dr. Holmberg testified about their findings from their evaluations of Mr. Jendresen under Wyo. Stat. Ann. § 7-11-303 (to assess his fitness to proceed in court) and § 7-11-304 (to assess his capacity at the time of the alleged crimes). Information from those evaluations is not admissible in any criminal proceeding on any issue other than the mental condition of the defendant. *See* Wyo. Stat. Ann. §§ 7-11-303(h); 7-11-304(h). Mr. Jendresen contends his counsel was deficient for failing to consider the statutory prohibition when he stipulated to the use of the experts' suppression hearing testimony at trial. He contends this mistake was prejudicial because the district court "did in fact rely" on Dr. Mahaffey's testimony regarding statements Mr. Jendresen made during his evaluations.

[¶44] Mr. Jendresen's argument overlooks the fact that his mental condition remained at issue at trial. While it is true that the district court relied on the diagnoses for its pretrial determination whether he validly waived his *Miranda* rights, Mr. Jendresen's mental condition was still at issue at trial with respect to the voluntariness of his confession. *See Connelly*, 479 U.S. at 163-64, 107 S.Ct. at 519-20 (distinguishing between the voluntariness of *Miranda* waiver under Fifth Amendment and voluntariness of confession under Due Process Clause of the Fourteenth Amendment). The district court recognized this in its Rule 21 decision, when it said: "To be clear, however, the court used none of the information gathered from Mr. Jendresen in his evaluations in making its ultimate decision regarding his guilt. Rather, again, that information was used solely to determine the issues of competence to waive *Miranda* rights *and to voluntarily make a confession*." (Emphasis added.) Further, Mr. Jendresen's counsel said he stipulated to the use of the confession videos at trial because he continued to believe Mr. Jendresen did not waive his rights, and he wanted to preserve the issue for appeal. Because Mr. Jendresen's evaluations were relevant to the voluntariness of his confession, the experts' suppression hearing testimony was admissible at trial and stipulating to it was a reasonable strategy to introduce evidence of Mr. Jendresen's mental condition. *Shields*, 2020 WY 101, ¶ 44, 468 P.3d at 1110.

[¶45] Nevertheless, Mr. Jendresen asserts his trial counsel should not have stipulated to the experts' testimony because there was a "risk" that statements he made in his evaluations could be used as substantive evidence of his guilt, in violation of Wyo. Stat.

Ann. §§ 7-11-303(h); 7-11-304(h).[3] He says the court's assertion "it did not rely on Mr. Jendresen's statements made to Dr. Mahaffey in its conclusion of guilt," is belied by its reference to Dr. Mahaffey's malingering diagnosis, which was based on Mr. Jendresen's protected statements. However, the court's reference to the malingering diagnosis was within the context of its finding Mr. Jendresen's statements "were voluntarily made." The malingering diagnosis was not part of the court's conclusion that Mr. Jendresen was guilty, but one of many factors informing its conclusion Mr. Jendresen knowingly and intelligently waived his rights and then confessed. For the issue of guilt, the court stated it relied on the corroboration of Mr. Jendresen's confession from I.J.'s forensic interview and his statements to his family, in addition to Mr. Jendresen's confession. Mr. Jendresen has not shown that his trial counsel's stipulation was either deficient performance or prejudicial.

## C.    Other Issues

[¶46] Mr. Jendresen raises additional complaints about his trial counsel that he did not raise in his W.R.A.P. 21 motion. "As a matter of practice, we strongly recommend that ineffective assistance arguments be raised and facts developed in the trial court. However, the failure to do so will not necessarily be fatal." *Pickering v. State*, 2020 WY 66, ¶ 56, 464 P.3d 236, 255 (Wyo. 2020) (footnote omitted). Mr. Jendresen now contends his counsel was ineffective in failing to: sequester each expert at the suppression hearing, recall Dr. Holmberg for rebuttal or as a trial witness, object to Dr. Mahaffey's unsolicited narrative testimony or to re-cross-examine her, and cross-examine fact witnesses at trial about Mr. Jendresen's mental state in the period before his arrest.

[¶47] "The purpose of sequestering witnesses is to prevent the tailoring of evidence to conform to prior testimony and to assist the parties in detecting falsehoods and testimony which is less than candid." *Gabriel v. State*, 925 P.2d 234, 236 (Wyo. 1996) (citation omitted). The Wyoming Rules of Evidence require the court to sequester a witness at the request of a party unless the opposing party can show the witness's presence is essential. W.R.E. 615. "The rule" applies to expert and fact witnesses alike. *Candelaria v. State*, 895 P.2d 434, 439 (Wyo. 1995), *overruled on other grounds by Allen v. State*, 2002 WY 48, 43 P.3d 551 (Wyo. 2002). Even had Mr. Jendresen's counsel invoked W.R.E. 615, sequestration would not have resulted in a better outcome. The parties filed expert reports which generally captured their expected testimony prior to the suppression hearing. We conclude Mr. Jendresen's trial counsel's failure to request sequestration did not cause prejudice.

---

[3] That risk is significantly reduced when, as here, the trial is not to a jury.

14

[¶48] Mr. Jendresen's claims that his counsel should have recalled Dr. Holmberg for rebuttal at the suppression hearing and at trial are essentially an extension of the previous argument. They fail, first, because each doctor took the opportunity to respond to the other's opinions at the suppression hearing. For example, during his direct examination, Dr. Holmberg discussed Dr. Mahaffey's malingering diagnosis and his reasons for believing Mr. Jendresen's memory loss was not feigned. Second, Dr. Holmberg had the opportunity to thoroughly rebut all of Dr. Mahaffey's opinions at the Rule 21 hearing, yet the district court remained unpersuaded. The court concluded Dr. Holmberg's opinion did not change substantially. The district court stated it was "fully aware" of Dr. Holmberg's opinions and considered them at trial.

[¶49] Mr. Jendresen next claims his trial counsel should have objected to Dr. Mahaffey's narrative testimony after her cross-examination. Mr. Jendresen must show that the testimony "was objectionable and that a lack of objection was not reasonable trial strategy." *Woods v. State*, 2017 WY 111, ¶ 20, 401 P.3d 962, 969 (Wyo. 2017). He lists Dr. Mahaffey's points during her narrative: a discussion of statements Mr. Jendresen made to a jail visitor which indicated he clearly remembered his offenses; her opinion that a person can have brief hallucinations, but they will not impair one's ability to respond rationally to police questioning; her opinion that Mr. Jendresen surprised himself in how far and for how long the offenses went on, and that he wanted them to stop; that Mr. Jendresen never denied what he told the police; that Dr. Holmberg's psychosis diagnosis lacked an explanation of specific symptoms and how they affected Mr. Jendresen's behavior during interrogation; and that Mr. Jendresen seemed to exaggerate his symptoms by telling police he was hallucinating that night. He does not explain how her points were objectionable, he merely concludes the testimony "could have been rebutted, as seen by [Dr. Holmberg's] testimony at the Rule 21 hearing," and it passed without objection, therefore the testimony was "permitted to stand and was relied upon as is at the bench trial when counsel stipulated to Dr. Mahaffey's suppression hearing testimony for trial." Mr. Jendresen's trial counsel could have objected on the basis that the testimony was narrative, or that it was unresponsive, however the testimony did not add anything new or inherently inadmissible—each point merely reinforced Dr. Mahaffey's opinion that Mr. Jendresen was trying to nullify his confession by portraying himself on the night of his arrest as someone with a severe mental disorder. We need not determine whether the failure to object was an unreasonable trial strategy, *see Winters*, 2019 WY 76, ¶ 32 n.9, 446 P.3d at 204 n.9, because even if it was, prejudice did not result. Dr. Mahaffey's narrative only restated her existing opinion, and the district court remained unpersuaded after Dr. Holmberg rebutted that opinion at the Rule 21 hearing.

[¶50] Mr. Jendresen also raises his trial counsel's failure to effectively cross-examine Dr. Mahaffey before or after her narrative. "[C]ross-examination technique is an aspect of trial strategy which is best left to the trial attorney rather than to the supervision of appellate courts." *Bruckner v. State*, 2018 WY 51, ¶ 22, 417 P.3d 178, 183 (Wyo. 2018)

(quoting *Mraz v. State*, 2016 WY 85, ¶ 48, 378 P.3d 280, 292 (Wyo. 2016)). "The fact that trial counsel may have pursued a different strategy does little to prove that assistance of counsel was ineffective." *Bruckner*, 2018 WY 51, ¶ 22, 417 P.3d at 183 (citing *Mraz*, 2016 WY 85, ¶ 48, 378 P.3d at 292). Mr. Jendresen's trial counsel did cross-examine Dr. Mahaffey before her narrative, and obtained significant concessions. Mr. Jendresen has not established that it was not a reasonable trial strategy to avoid giving Dr. Mahaffey an opportunity to reinforce her position. *Shields*, 2020 WY 101, ¶ 64, 468 P.3d at 1115.

[¶51] Finally, Mr. Jendresen complains that his trial counsel should have cross-examined Mrs. Jendresen and Mr. Price about Mr. Jendresen's mental state in the period leading up to his arrest because they had made several statements on the police videos that indicated he may have been psychotic. For support he cites *Asch v. State*, 2003 WY 18, 62 P.3d 945 (Wyo. 2003) and subsequent cases where we said *Asch* "involved a failure to effectively cross-examine a key witness." *Pickering*, 2020 WY 66, ¶ 68, 464 P.3d 236, 258 (Wyo. 2020) (quoting *Winters*, 2019 WY 76, ¶ 52 n.13, 446 P.3d at 209 n.13). At issue in *Asch* and its progeny were counsels' failures to interview key witnesses which led to unsuccessful cross-examinations. The failure to interview a key witness "constitute[s] an abrogation of counsel's duty to . . . conduct a reasonable investigation and to utilize any information obtained in providing a reasonable defense. When this deficiency is demonstrated, the appellant need not demonstrate the resulting prejudice, it is presumed." *King v. State*, 810 P.2d 119, 123 (Wyo. 1991) (alterations in original; citation omitted). But when a defendant fails to explain what evidence he would have been able to elicit on cross-examination had trial counsel conducted an interview, we have declined to presume prejudice. *See, e.g.*, *Winters*, 2019 WY 76, ¶ 55, 446 P.3d at 210 (Defendant failed to identify what helpful points could have been made on cross-examination had his counsel interviewed the State's DNA expert.). We have also recognized that whether, or to what extent, to cross-examine a witness is a strategic decision. *Id.* at ¶ 48, 446 P.3d at 208 (quoting *Barkell v. State*, 2002 WY 153, ¶ 23, 55 P.3d 1239, 1244 (Wyo. 2002)). "The risk of excessive cross-examination is that the witness may reconcile inconsistencies, additional unfavorable testimony may be elicited, and ineffective efforts to attack credibility may in fact enhance the witness's testimony." *Winters*, 2019 WY 76, ¶ 48, 446 P.3d at 208.

[¶52] Extensively cross-examining Mrs. Jendresen and Mr. Price may have been risky to the defense, and was unnecessary to establish Mr. Jendresen's mental state prior to his arrest. The arrest videos capture Mr. Price commenting that, before Mr. Jendresen was arrested, Mr. Jendresen had a "melt down," that he was "flipped out," "berserk," "out of the zone," "weird," and "odd." They also capture Mrs. Jendresen saying Mr. Jendresen was "acting weird" and screaming on the evening prior to his arrest and that he had a history of psychotic episodes. Mr. Jendresen's trial counsel's cross-examination strategy avoided unpredictable, potentially harmful testimony, therefore it was a reasonable strategy to limit their cross-examination. Furthermore, because the evidence he wished to elicit was already before the court, there was no prejudice. We deny the foregoing claims

16

of ineffective assistance of counsel because the omissions were within the range of professionally competent assistance, and they caused no prejudice. *Lewis*, 2020 WY 110, ¶ 18, 470 P.3d at 569-70.

### III. *Mr. Jendresen Did Not Suffer Cumulative Prejudice*

[¶53] Mr. Jendresen claims the omissions of his trial counsel accumulated to cause him prejudice. "[A] series of . . . errors will only be cause for reversal where the accumulated effect constitutes prejudice and the conduct of the trial is other than fair and impartial." *Armajo v. State*, 2020 WY 153, ¶ 42, 478 P.3d 184, 195 (Wyo. 2020) (quoting *Bogard v. State*, 2019 WY 96, ¶ 69, 449 P.3d 315, 332 (Wyo. 2019)). "'Each cumulative error analysis is unique' and requires 'we evaluate the possibility of prejudice in the context of the entire record.'" *Armajo*, 2020 WY 153, ¶ 42, 478 P.3d at 195 (citation omitted). In this case, the district court had ample evidence that Mr. Jendresen knowingly and intelligently waived his rights, therefore his detailed confession was properly admitted. With the confession and the State's corroborating evidence against him, there was no reasonable probability Mr. Jendresen would have had a more favorable outcome. *See Dixon*, 2019 WY 37, ¶ 59, 438 P.3d at 237. Mr. Jendresen was not cumulatively prejudiced by the various actions of his trial counsel.

### *CONCLUSION*

[¶54] Mr. Jendresen knowingly and intelligently waived his rights and confessed to law enforcement that he sexually abused his daughter. He was afforded effective assistance of counsel at each phase of his prosecution. Therefore, we affirm.